# FORD MOTOR CO. (CHICAGO STAMPING PLANT) *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 77–1806.   Argued February 28, 1979—Decided May 14, 1979

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, POWELL, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 503. BLACKMUN, J., filed an opinion concurring in the result, *post*, p. 504.

*Theophil C. Kammholz* argued the cause for petitioner. With him on the briefs were *Stanley R. Strauss* and *William J. Rooney.*

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General McCree, Deputy Solicitor General Wallace,* and *John S. Irving. John A. Fillion* argued the cause for respondent United Automobile Workers Local 588. With him on the

brief were *M. Jay Whitman, Irving M. Friedman,* and *Jerome Schur.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The principal question [1] in this case is whether prices for in-plant cafeteria and vending machine food and beverages are "terms and conditions of employment" subject to mandatory collective bargaining under §§ 8 (a)(5) and 8 (d) of the National Labor Relations Act. 49 Stat. 452, as amended, 29 U. S. C. §§ 158 (a)(5) and 158 (d).[2]

---

*P. Kevin Connelly* filed a brief for the National Automatic Merchandising Assn. as *amicus curiae* urging reversal.

*J. Albert Woll, Robert Mayer,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] The National Labor Relation Board's order at issue here directed petitioner to bargain with respondent Union "with respect to food services and changes in food prices in [petitioner's in-plant] vending machines and cafeteria. . . ." *Ford Motor Co. (Chicago Stamping Plant),* 230 N. L. R. B. 716, 719 (1977), enf'd, 571 F. 2d 993 (CA7 1978). The duty to bargain over nonprice aspects of in-plant food services is thus also at issue here. The Board's order also obligated petitioner to supply respondent Union with the information necessary for bargaining. 230 N. L. R. B., at 719. It seems agreed that if food prices and service are mandatory bargaining subjects, the order to furnish information should stand. See *Detroit Edison Co.* v. *NLRB,* 440 U. S. 301, 303 (1979).

[2] The relevant provisions of the National Labor Relations Act are as follows:

"SEC. 8. (a) It shall be an unfair labor practice for an employer—

.        .        .        .        .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a).

.        .        .        .        .

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if

I

Petitioner, Ford Motor Co., operates an automotive parts stamping plant in Chicago Heights, Ill., employing 3,600 hourly rated production employees. These employees are represented in collective bargaining with Ford by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and by its administrative component, Local 588, a respondent here.

For many years, Ford has undertaken to provide in-plant food services to its Chicago Heights employees.[3] These services, which include both cafeterias and vending machines, are managed by an independent caterer, ARA Services, Inc.

requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .

. . . .

"SEC. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." As amended, 61 Stat. 140, 142, 143.

As originally enacted, the Wagner Act did not define the subjects of § 8 (a) (5)'s obligation to bargain, although § 9 (a), which was contained in the Wagner Act, made reference to "rates of pay, wages, hours of employment, or other conditions of employment." Section 8 (d) was added by the Taft-Hartley amendments to the Act in 1947, and expressly defined the scope of the duty to bargain as including "wages, hours, and other terms and conditions of employment." The relevant details of this development are discussed *infra,* at 495–496.

[3] It is difficult for employees to eat away from the plant during their shifts. The lunch period is 30 minutes, and the few restaurants in the vicinity are all over a mile away, in an area heavily saturated with industrial plants employing thousands of workers. As a result, very few of the 3,600 workers leave the plant during the lunch period. Two 22-minute rest breaks are also provided during the shifts, but employees are not permitted to leave the plant then.

Some workers bring food to work. No refrigerated storage facilities are provided, however, and spoilage and vermin are a problem, particularly in the summer.

Under its contract with Ford, ARA furnishes the food, management, machines, and personnel in exchange for reimbursement of all direct costs and a 9% surcharge on net receipts.[4] Ford has the right to review and approve the quality, quantity, and price of the food served.

Over the years, Ford and the Union have negotiated about food services. The National Labor Relations Board (Board) found:

> "Since 1967, the local contract has included provisions dealing with vending and cafeteria services. The contracts have covered the staffing of service lines, adequate cafeteria supervision, restocking and repairing vending machines, and menu variety. The 1974 local agreement also states, 'the Company recognized its continuing responsibility for the satisfactory performance of the caterer and for the expeditious handling of complaints concerned with such performance.'" *Ford Motor Co.* (*Chicago Stamping Plant*), 230 N. L. R. B. 716 (1977), enf'd, 571 F. 2d 993 (CA7 1978).

Ford, however, has always refused to bargain about the prices of food and beverages served in its in-plant facilities.

On February 6, 1976, Ford notified the Union that cafeteria and vending machine prices would be increased shortly by unspecified amounts. The Union requested bargaining over both price and services and also asked for information relevant to Ford's involvement in food services in order to assist bargaining. These requests were refused by Ford, which took the position that food prices and services are not terms or conditions of employment subject to mandatory bargaining.

---

[4] If receipts exceed ARA's cost plus the 9% surcharge, Ford is entitled to the excess. If revenues do not meet the costs of the operation plus the surcharge, the company is obligated to pay ARA up to $52,000 a year. In recent years, deficits have occurred often. In meeting the deficits, Ford has thereby subsidized employee meals and indirectly influenced the price of the food sold.

The Union then filed an unfair labor practice charge with the Board, alleging a refusal to bargain contrary to § 8 (a) (5).[5] The Board sustained the charge, ordering Ford to bargain on both food prices and services and to supply the Union with the relevant information requested. *Ford Motor Co. (Chicago Stamping Plant), supra.* In doing so, the Board reaffirmed its position, expressed in several prior cases, that prices of in-plant-supplied food and beverages are generally mandatory bargaining subjects, a position that had not been accepted by reviewing courts.[6] The Board also noted that the circumstances of this case made it a particularly strong one for invoking the duty to bargain.[7]

[5] The Union also began a boycott of food services in which more than half of the employees participated. The boycott ended slightly more than three months later without any reductions in prices.

[6] *Westinghouse Electric Corp.,* 156 N. L. R. B. 1080, 1081, enf'd, 369 F. 2d 891 (CA4 1966), rev'd en banc, 387 F. 2d 542 (1967); *McCall Corp.,* 172 N. L. R. B. 540 (1968), enf. denied, 432 F. 2d 187 (CA4 1970); *Package Machinery Co.,* 191 N. L. R. B. 268 (1971), enf. denied, 457 F. 2d 936 (CA1 1972); *Ladish Co.,* 219 N. L. R. B. 354 (1975), enf. denied, 538 F. 2d 1267 (CA7 1976).

[7] See *Ford Motor Co. (Chicago Stamping Plant),* 230 N. L. R. B., at 717–718, n. 11:

"We note that the instant case, on its facts, is in many respects a stronger case than *Ladish* for adhering to our position. Unlike *Ladish,* where the respondent had no input on prices, the Respondent in this case retains influence over cafeteria and vending machine prices by its right to review prices and its leverage of the subsidy agreement. In addition, there also exists the possibility for the Respondent to make a profit on the food service operation. Also, since 1967, the parties in this case have bargained over in-plant food services. No such bargaining history was present in *Ladish.* Moreover, in *Ladish,* the court implied that 'brown-bagging' is a viable alternative to purchasing lunch from the commercial food service. However, in this case, employees have complained about spoilage of food stored in their lockers until lunch, as well as unsanitary conditions in the locker room (wherein the Respondent has found it necessary on occasion to exterminate). Additionally, the employees have apparently been so concerned with the food pricing that over half of them

The case came before the Court of Appeals for the Seventh Circuit on Ford's petition for review and the Board's cross-petition for enforcement. That court, while adhering to its prior decision in *NLRB* v. *Ladish Co.,* 538 F. 2d 1267 (1976), which had refused enforcement of a Board order to bargain about in-plant food prices, enforced the Board's order here because, "under the facts and circumstances of this case, in-plant cafeteria and vending machine food prices and services materially and significantly affect and have an impact upon terms and conditions of employment and therefore are mandatory subjects of bargaining." 571 F. 2d, at 1000. The court was particularly influenced by the lack of reasonable eating alternatives for employees, declaring that "[t]he food one must pay for and eat as a captive customer within the employer's plant can be viewed as a physical dimension of one's working environment." *Ibid.*

Because of the importance of the issue and the apparent conflict between the decision below and decisions of other Circuits, see n. 6, *supra,* we granted certiorari. 439 U. S. 891 (1978). We affirm the judgment of the Court of Appeals for the Seventh Circuit enforcing the Board's order to bargain.

## II

The Board has consistently held that in-plant food prices are among those terms and conditions of employment defined

participated in a boycott of the Respondent's food service operations. There was no such labor strife involved in *Ladish.* Lastly, in *Ladish* the employees were represented by seven unions. The court therein projected that each time the food prices were raised 'the Company could be compelled to engage in seven rounds of negotiations.' 538 F. 2d at 1272. This fact, the court declared, 'provides a good example of a situation in which bargaining could be both disruptive of stable relations and economically wasteful.' *Id.* In the instant case, however, the employees are represented by a single union. While we adhere to the view that the number of unions representing employees at a single plant is not a factor in resolving this issue, we nevertheless note that, even in the court's view, there is no potential for conflicting union demands in this case."

in § 8 (d) and about which the employer and union must bargain under §§ 8 (a)(5) and 8 (b)(3). See n. 6, *supra.* Because it is evident that Congress assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain and because the "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise," *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676, 685–686 (1965), its judgment as to what is a mandatory bargaining subject is entitled to considerable deference.

Section 8 (a)(5) of the National Labor Relations Act, as originally enacted, declared it an unfair practice for the employer to refuse to bargain collectively. Act of July 5, 1935, 49 Stat. 453. Although the Act did not purport to define the subjects of collective bargaining, § 9 (a) made the union selected by a majority in a bargaining unit the exclusive representative of the employees for bargaining about "rates of pay, wages, hours of employment, or other conditions of employment." Under these provisions, the Board was left with the task of identifying on a case-by-case basis those "other conditions of employment" over which management was required to bargain.

In 1947, the Taft-Hartley Act amended the National Labor Relations Act to obligate unions as well as management to bargain; and § 8 (d) explicitly defined the duty of both sides to bargain as the obligation to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 61 Stat. 142, now codified at 29 U. S. C. § 158 (d). The original House bill had contained a specific listing of the issues subject to mandatory bargaining, H. R. 3020, 80th Cong., 1st Sess., § 2 (11) (1947); H. R. Rep. No. 245, 80th Cong., 1st Sess., 22–23, 49 (1947), but this attempt to "strait-jacke[t]" and to "limit narrowly the subject matters appropriate for collective bargaining,"

*id.,* at 71 (minority report); [8] see also 93 Cong. Rec. 3446–3447 (1947) (remarks of Rep. Klein), was rejected in conference in favor of the more general language adopted by the Senate and now appearing in § 8 (d). S. 1126, 80th Cong., 1st Sess., § 8 (d) (1947); see 93 Cong. Rec. 6444 (1947) (summary report of Sen. Taft); cf. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 8, 34 (1947). It is thus evident that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain. This case, therefore, is one of those situations in which we should "recognize without hesitation the primary function and responsibility of the Board . . . ," *NLRB* v. *Insurance Agents,* 361 U. S. 477, 499 (1960), which is that "of applying the general provisions of the Act to the complexities of industrial life . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' " *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236 (1963), quoting *NLRB* v. *Steelworkers,* 357 U. S. 357, 362–363 (1958).[9]

---

[8] The Report declared:

"The appropriate scope of collective bargaining cannot be determined by a formula; it will inevitably depend upon the traditions of an industry, the social and political climate at any given time, the needs of employers and employees, and many related factors. What are proper subject matters for collective bargaining should be left in the first instance to employers and trade unions, and in the second place, to any administrative agency skilled in the field and competent to devote the necessary time to a study of industrial practices and traditions in each industry or area of the country, subject to review by the courts. It cannot and should not be strait-jacketed by legislative enactment." H. R. Rep. No. 245, 80th Cong., 1st Sess., 71 (1947) (minority report).

[9] See also *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.,* 404 U. S. 157, 178 (1971) ("Section 8 (d) of the Act, of course, does not immutably fix a list of subjects for mandatory bargaining"); *East Bay Union of Machinists* v. *NLRB,* 116 U. S. App. D. C. 198, 201, 322 F. 2d

Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute. *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978). In the past we have refused enforcement of Board orders where they had "no reasonable basis in law," either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning. *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 166 (1971). We have also parted company with the Board's interpretation where it was "fundamentally inconsistent with the structure of the Act" and an attempt to usurp "major policy decisions properly made by Congress." *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965). Similarly, in *NLRB* v. *Insurance Agents, supra*, at 499, we could not accept the Board's application of the Act where we were convinced that the Board was moving "into a new area of regulation which Congress had not committed to it."

The Board is vulnerable on none of these grounds in this case. Construing and applying the duty to bargain and the language of § 8 (d), "other terms and conditions of employment," are tasks lying at the heart of the Board's function. With all due respect to the Courts of Appeals that have held otherwise, we conclude that the Board's consistent view that in-plant food prices and services are mandatory bargaining subjects is not an unreasonable or unprincipled construction of the statute and that it should be accepted and enforced.

---

411, 414 (1963) (Burger, J.) ("The use of this language was a reflection of the congressional awareness that the act covered a wide variety of industrial and commercial activity and a recognition that collective bargaining must be kept flexible without precise delineation of what subjects were covered so that the Act could be administered to meet changing conditions"), aff'd *sub nom. Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203 (1964).

It is not suggested by petitioner that an employee should work a full 8-hour shift without stopping to eat. It reasonably follows that the availability of food during working hours and the conditions under which it is to be consumed are matters of deep concern to workers, and one need not strain to consider them to be among those "conditions" of employment that should be subject to the mutual duty to bargain. By the same token, where the employer has chosen, apparently in his own interest, to make available a system of in-plant feeding facilities for his employees, the prices at which food is offered and other aspects of this service may reasonably be considered among those subjects about which management and union must bargain.[10] The terms and conditions under which food is available on the job are plainly germane to the "working environment," *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U. S. 203, 222 (1964) (STEWART, J., concurring). Furthermore, the company is not in the business of selling food to its employees, and the establishment of in-plant food prices is not among those "managerial decisions, which lie at the core of entrepreneurial control." *Id.,* at 223 (STEWART, J., concurring). The Board is in no sense attempting to permit the Union to usurp managerial decisionmaking; nor is it seeking to regulate an area from which Congress intended to exclude it.

Including within § 8 (d) the prices of in-plant-supplied food and beverages would also serve the ends of the National Labor Relations Act. "The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to insure that employers and their employees could work together to establish mutually satisfactory conditions. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive,

---

[10] We should not be understood as holding that whether in-plant food services are to be provided where such services do not already exist is a mandatory bargaining subject. That issue is not involved here.

open discussions leading, it was hoped, to mutual agreement." *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 103 (1970). As illustrated by the facts of this case, substantial disputes can arise over the pricing of in-plant-supplied food and beverages. National labor policy contemplates that areas of common dispute between employers and employees be funneled into collective bargaining. The assumption is that this is preferable to allowing recurring disputes to fester outside the negotiation process until strikes or other forms of economic warfare occur.

The trend of industrial practice supports this conclusion. In response to increasing employee concern over the issue, many contracts are now being negotiated that contain provisions concerning in-plant food services.[11] In this case, as

---

[11] See, *e. g.,* 2 Bureau of National Affairs, Collective Bargaining (Negotiation and Contracts) 95:421–95:424 (1976). See also the following arbitration decisions construing collective-bargaining agreements to cover the cost of employer-supplied food as a condition of employment: *Universal Form Clamp Co.,* 68 Lab. Arb. 1223 (Miller, 1977) (cost of coffee); *Hilton Hotels Corp.,* 42 Lab. Arb. 1267, 1270–1272 (Hanlon, 1964) (cost and type of meals); *Greater Los Angeles Zoo Assn.,* 60 Lab. Arb. 838 (Christopher, 1973) (employer may not discontinue practice of providing free meals to zoo food venders when contract provided that there would be no reduction of employee benefits); *Alpena General Hospital,* 50 Lab. Arb. 48 (Jones, 1967), and *Lutheran Medical Center,* 44 Lab. Arb. 107 (Wolf, 1964) (free meals are working condition).

A survey conducted by the Bureau of National Affairs' Personnel Policies Forum found that 54% of the responding companies provided food services for employees using a lunchroom with vending machines; 43% of the companies provided cafeterias; and 15% provided vending machines with snackbar service. BNA, Labor Policy and Practice Series (Personnel Management) 245:201–245:204 (1976). The National Industrial Conference Board in 1964 reported that 47% of the manufacturing companies that responded to a survey provided cafeteria services, and 55% of the companies subsidized the operation. Only 8% of the companies reported that they were trying to operate the cafeterias at a profit. NICB, Personnel Practices in Factory and Office: Manufacturing, Personnel Policy Study No. 194, pp. 76–77 (1964). Cf. Fisher, Operating Your Firm's Dining Area—Profitably, Administrative Management, Oct. 1966, pp. 66–

already noted, local agreements between Ford and the Union have contained detailed provisions about nonprice aspects of in-plant food services for several years. Although not conclusive, current industrial practice is highly relevant in construing the phrase "terms and conditions of employment." [12]

## III

Ford nevertheless argues against classifying food prices and services as mandatory bargaining subjects because they do not "vitally affect" the terms and conditions of employment within

67; Scheer, The Company Cafeteria, 45 Personnel J. 85–86 (1966); Feeding the Big Captive Customers, Business Week, Oct. 27, 1975, pp. 46–54.

Although the decision below by the Seventh Circuit was the first to uphold the Board's order to bargain about the prices of in-plant-supplied food services, other aspects of food services have been found to be covered by § 8 (d). These include improvement in lunchroom equipment and supplies, *Preston Products Co.*, 158 N. L. R. B. 322 (1966), aff'd in relevant part, 129 U. S. App. D. C. 196, 392 F. 2d 801 (1967), cert. denied, 392 U. S. 906 (1968); coffeebreak scheduling and service of free coffee, *Missourian Pub. Co.*, 216 N. L. R. B. 175, 180 (1975); *D & C Textile Corp.*, 189 N. L. R. B. 769, 771, 783 (1971); *Fleming Mfg. Co.*, 119 N. L. R. B. 452, 455 (1957); free meal policy, *O'Land, Inc., d/b/a Ramada Inn South*, 206 N. L. R. B. 210, 214–215 (1973); cancellation of catering truck service, *Bralco Metals, Inc.*, 214 N. L. R. B. 143, 146–150 (1974); meal areas, *Hasty Print, Inc., d/b/a Walker Color Graphics*, 227 N. L. R. B. 455, 461 (1976); and cleanup of lunchroom areas by employees, *Cosmo Graphics, Inc.*, 217 N. L. R. B. 1061, 1066 (1975).

And, where no in-plant facilities exist, employers are still obligated to bargain about meal hours and coffee breaks. See, *e. g., Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S., at 222 (STEWART, J., concurring); *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 691 (1965).

[12] "While not determinative, it is appropriate to look to industrial bargaining practices in appraising the propriety of including a particular subject within the scope of mandatory bargaining. *Labor Board* v. *American Nat. Ins. Co.*, 343 U. S. 395, 408. Industrial experience is not only reflective of the interests of labor and management in the subject matter but is also indicative of the amenability of such subjects to the collective bargaining process." *Fibreboard Paper Products Corp.* v. *NLRB, supra,* at 211.

the meaning of the standard assertedly established by *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S., at 176, and because they are trivial matters over which neither party should be required to bargain.

There is no merit to either of these aguments. First, Ford has misconstrued *Pittsburgh Plate Glass*. That case made it clear that while § 8 (d) normally reaches "only issues that settle an aspect of the relationship between the employer and employees[,] matters involving individuals outside the employment relationship . . . are not wholly excluded." 404 U. S., at 178. In such instances, as in *Teamsters* v. *Oliver*, 358 U. S. 283 (1959), and *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203 (1964), the test is not whether the "third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it vitally affects the 'terms and conditions' of their employment." 404 U. S., at 179. Here, however, the matter of in-plant food prices and services is an aspect of the relationship between Ford and its own employees. No third-party interest is directly implicated, and the standard of *Pittsburgh Plate Glass* has no application.

As for the argument that in-plant food prices and service are too trivial to qualify as mandatory subjects, the Board has a contrary view, and we have no basis for rejecting it. It is also clear that the bargaining-unit employees in this case considered the matter far from trivial since they pressed an unsuccessful boycott to secure a voice in setting food prices. They evidently felt, and common sense also tells us, that even minor increases in the cost of meals can amount to a substantial sum of money over time. In any event, we accept the Board's view that in-plant food prices and service are conditions of employment and are subject to the duty to bargain.

Ford also argues that the Board's position will result in unnecessary disruption because any small change in price or service will trigger the obligation to bargain. The problem, it

is said, will be particularly acute in situations where several unions are involved,[13] possibly requiring endless rounds of negotiations over issues as minor as the price of a cup of coffee or a soft drink.

These concerns have been thought exaggerated by the Board. Its position in this case, as in all past cases involving the same issue, is that it is sufficient compliance with the statutory mandate if management honors a specific union request for bargaining about changes that have been made or are to be made. *Ford Motor Co. (Chicago Stamping Plant)*, 230 N. L. R. B., at 718; *Westinghouse Electric Corp.*, 156 N. L. R. B. 1080, 1081, enf'd, 369 F. 2d 891 (CA4 1966), rev'd en banc, 387 F. 2d 542 (1967). The Board apparently assumes that, as a practical matter, requests to bargain will not be lightly made. Moreover, problems created by constantly shifting food prices can be anticipated and provided for in the collective-bargaining agreement. Furthermore, if it is true that disputes over food prices are likely to be frequent and intense, it follows that more, not less, collective bargaining is the remedy. This is the assumption of national labor policy, and it is soundly supported by both reason and experience.[14]

---

[13] This factor is essentially irrelevant to the determination in this case. The definition of a mandatory collective-bargaining subject does not depend on the number of unions within the bargaining unit. *Westinghouse Electric Corp.*, 156 N. L. R. B., at 1089; *McCall Corp.*, 172 N. L. R. B., at 547.

[14] See, *e. g., Fibreboard Paper Products Corp.* v. *NLRB, supra*, at 211 ("The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife"); *Westinghouse Electric Corp.* v. *NLRB*, 369 F. 2d, at 895 ("The underlying philosophy of the Labor Act is that discussion of issues between labor and management serves as a valuable prophylactic by removing grievances, real or fancied, and tends to improve and stabilize labor relations"); see also Cox, The Duty to Bargain in Good Faith, 71 Harv. L. Rev. 1401, 1412 (1958): "Participation in debate often produces changes in a seemingly fixed position either because new facts are brought to light or because the strengths and weaknesses of the several arguments become apparent.

Finally, Ford asserts that to require it to engage in bargaining over in-plant food service prices would be futile because those prices are set by a third-party supplier, ARA. It is true that ARA sets vending machine and cafeteria prices, but under Ford's contract with ARA, Ford retains the right to review and control food services and prices. In any event, an employer can always affect prices by initiating or altering a subsidy to the third-party supplier such as that provided by Ford in this case, and will typically have the right to change suppliers at some point in the future. To this extent the employer holds future, if not present, leverage over in-plant food services and prices.[15]

We affirm, therefore, the Court of Appeals' judgment upholding the Board's determination in this case that in-plant food services and prices are "terms and conditions of employment" subject to mandatory bargaining under §§ 8 (a)(5) and 8 (d) of the National Labor Relations Act.

*So ordered.*

MR. JUSTICE POWELL, concurring.

The Court today holds that prices for in-plant cafeteria and vending machine food and beverages are "terms and conditions of employment" subject to mandatory collective bargaining under the National Labor Relations Act. Although this view of the Act has been taken consistently by the National Labor Relations Board, none of the courts of appeals

---

Sometimes the parties hit upon some novel compromise of an issue which has been thrashed over and over. Much is gained even by giving each side a better picture of the strength of the other's convictions. The cost is so slight that the potential gains easily justify legal compulsion to engage in the discussion."

[15] In-plant food services provided by third parties are not unlike other kinds of benefits, such as health insurance, implicating outside suppliers. In each case, the employer contracts with a third party to provide a benefit to employees and, during the term of the contract, is unable to change the price at which that benefit is available to the employee except by employee subsidies.

has agreed with the absolute approach of the Board. Rather, these courts in general have taken the position that whether bargaining with respect to in-plant food service was required depends upon the facts and circumstances of each case. Although the Court of Appeals for the Seventh Circuit enforced the Board's order in this case, it did so on a "facts and circumstances" basis.

I had thought that the case-by-case approach was more likely to be fair to both employer and union than is the mandatory bargaining rule adopted today. The conditions and circumstances under which in-plant food service is provided can and do vary widely among the thousands of enterprises subject to the Act. Yet, curiously enough, neither petitioner nor respondent union in this case supports the "facts and circumstances" approach of the Court of Appeals. On balance, I suppose there is merit in having a "bright line" with respect to this issue. This does put the parties to all collective bargaining on prior notice, with a reasonable expectation that the issue usually will be resolved in advance at the bargaining table. I am, therefore, persuaded to join the Court's opinion.

MR. JUSTICE BLACKMUN, concurring in the result.

I am in accord with much—indeed with most—of what the Court pronounces in its opinion, and I join its judgment.

My concern is with the last two sentences of the penultimate paragraph of the Court's opinion. *Ante,* at 503. The Court there says that "[i]n any event" an employer, by *initiating* or altering a subsidy to a third-party supplier, "can always affect prices" and "will typically have the right to change suppliers at some point in the future." Thus, to this extent, "the employer holds future, if not present, leverage over in-plant food services and prices." To me, this language seems to say that Ford's control over prices under the facts of this case is really irrelevant to the "mandatory subject" inquiry, and seems to imply that an employer must bargain about prices even if he has no actual control over them at all.

Any employer, of course, could achieve some measure of future control over prices, by initiating a subsidy or by changing suppliers. That future possibility, however, should not be enough.

If the employer has no control over prices, bargaining about them is futile. If the employer rents space in a corner of the plant to a restaurateur, and thereafter maintains a "hands off" attitude and has no input into the food operation, it is difficult for me to see how bargaining about food prices makes any sense. The employer has no more control over prices by virtue of its landlord status than it has over prices charged at the hamburger shop across the street. If the employer really has no control over prices, moreover, it is not obvious that the prices charged "settle an aspect of the relationship between the employer and employees," *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 178 (1971), a precondition for mandatory bargaining status. The pertinent relationship is then between the restaurateur and the employees. If the employer has no control over prices and services whatsoever, and if he nevertheless is required to bargain about them because in the future he might be able to exercise some control over them, the employer's "managerial decision making" may well be usurped, and we are close to the basic concern of the concurrence in *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203, 222 (1964).

I think it is unwise to go out of our way to hold—if the Court does so here—that an employer with no present actual influence or control over food prices should be forced to bargain about them because of the mere possibility that he might have "future leverage." That situation is not presented in this case, and I see no need for the Court to decide it. For now, I prefer only a general rule that food prices are mandatorily bargainable so long as the employer, as here, has some measure of actual influence over the prices charged.

I thus join the Court in the result it reaches in this case. I would reserve other situations for another day.