IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60358

_____

EXXON RESEARCH & ENGINEERING COMPANY;
EXXON COMPANY, U.S.A.; EXXON CHEMICAL
AMERICAS; EXXON CHEMICAL COMPANY,

                              Petitioners-Cross-Respondents,

                    versus

NATIONAL LABOR RELATIONS BOARD,

                              Respondent-Cross-Petitioner.

_____

Petition for Review and Cross-Petition for Enforcement of an
                          Order of the
              National Labor Relations Board

_____

July 16, 1996

Before GARWOOD, HIGGINBOTHAM, and BENAVIDES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

     This case presents the question whether an employer's failure
to bargain with its unions regarding unilateral changes made to a
benefit plan governed by the Employee Retirement Income Security
Act, 29 U.S.C. §§ 1001 et seq., and ordered by the plan's trustees
constitutes an unfair labor practice.  The National Labor Relations
Board held several divisions of Exxon Corporation and one of its
subsidiaries responsible for the changes authorized by the plan
trustees.  The Exxon companies did not order the changes in the
plan's terms and we deny enforcement of the NLRB's order.

I.

Exxon Company, U.S.A., Exxon Chemical Americas, and Exxon Chemical Company are divisions of Exxon Corporation. Exxon Research & Engineering Company is a wholly-owned subsidiary of Exxon. EUSA, ECA, and ERE operate a petrochemical refinery and research complex in Baytown, Texas. ECC operates a chemical manufacturing plant in Houston, Texas. We refer to the four Exxon companies as "the Exxon subsidiaries"--their separate identities are not material to this suit.

Four unions, the Gulf Coast Industrial Workers Union, the Baytown Employees' Federation, the International Association of Machinists & Aerospace Workers, Lodge 1051, and the International Brotherhood of Electrical Workers Local No. 527, represent 1900 of the employees in 10 distinct bargaining units at the Baytown and Houston facilities. In late 1992, there were 10 separate collective bargaining agreements in place between the four Exxon subsidiaries and the four unions, one for each bargaining unit. All but one of those agreements contained a provision identical or substantially identical to the following:

> This Agreement shall not affect the eligibility of employees for participation in any company benefit plan (annuity plan, thrift plan, disability plans, contributory group life insurance plan, and noncontributory group life insurance plan), dependency pay for military leave and military-leave pay, or any other Company benefit plan now in effect, all of which plans and programs shall be governed by their separate provisions. This provision, however, is not a waiver of

2

such right as the Union has to bargain concerning these plans.[1]

In 1935, Exxon Corporation's predecessor, Standard Oil Company of New Jersey, created the Thrift Plan to encourage long-term savings and provide supplemental retirement income to company employees. The Thrift Plan currently has $6 billion in assets and includes approximately 35,000 participants. Five trustees administer the Plan. Exxon retains the "virtually unbridled" power to appoint, remove, and replace trustees at will. Under the Plan's terms, employees contribute to the Plan and Exxon matches the employees' contribution, up to 7% of each individual employee's income. Significantly, the Plan allows participants to obtain short-term loans from the Thrift Fund.

Changes may be made to the Plan's terms through one of two mechanisms. First, the Plan's Trustor, Exxon, may amend the plan pursuant to its authority under the Thrift Trust Declaration of Trust. Second, the Plan trustees have limited authority to make "administrative changes" to the Plan pursuant to various sections of the Declaration, the mechanism at issue here.

In 1992, the trustees decided to make seven changes to the Thrift Plan. Only two of the changes, both to the Thrift Plan's

---

[1] The other plan between Exxon Chemical Co. and the GCIWU provides in relevant part that "nothing in this Agreement shall apply to or affect the Exxon Benefit Plan or any other of the Company's benefit plans or programs. This provision, however, is not a waiver of such rights as the Union has to bargain concerning such plans or programs." Neither Exxon or the NLRB assert that this agreement's different wording distinguishes it from the other collective bargaining agreements.

3

loan program, concern us.[2]  Effective January 1, 1993, the maximum number of allowable loans outstanding at one time were to be reduced from four to two, and the minimum allowable loan amount was increased from $40 to $1000.  The Plan trustees enacted these changes pursuant to the plan provision governing the loan program:

> If an active participant, during the preceding six months, has not borrowed any amount under this part, then, to the extent and on the terms permitted by the Trustee, such participant may at any time borrow from the Trustee any amount of cash the participant specifies, but not in excess of one-half of the accrued collateral value of the participant's Thrift Fund Account on the date the loan is granted.[3]

On August 12, 1992, David Clements, EUSA's human resources manager for the Houston area, notified representatives of the four unions of the proposed changes.  Over two months later, the unions demanded bargaining over the proposed changes.  Responding to the unions' demand, Clements met with the union representatives on November 17, 1992.  Clements asked the unions to withdraw their request for bargaining.  He informed them that their demand would jeopardize the parties' bargaining relationship and that bargaining would begin with "a blank sheet of paper."  The unions reasserted their request for bargaining, which the Exxon subsidiaries refused

---

[2]     The NLRB did not object to two of the changes in its complaint.  The ALJ found that, of the five amendments to which the NLRB objected, three did not constitute "material, substantial, and significant" changes so as to trigger the Exxon subsidiaries' duty to bargain regarding those changes.  The NLRB affirmed the ALJ's finding on this point.

[3]     We assume but do not decide that the trustees possessed the authority to make these changes to the loan program and that the changes did not require an amendment to the Plan's Declaration by Exxon itself.

as untimely.  The unions subsequently filed unfair labor practice complaints against the Exxon subsidiaries.  The proposed changes to the loan program went into effect as planned on January 1, 1993.

The NLRB Regional Director consolidated the unions' charges and issued a complaint.  The complaint alleged that the Exxon subsidiaries violated § 8(a)(5) by refusing to bargain before implementing the changes to their thrift plan and that they violated § 8(a)(1) by threatening adverse consequences if the unions pursued bargaining over the issue.  The NLRB referred the matter for a hearing before an Administrative Law Judge.

After conducting the hearing, the ALJ concluded that Exxon violated § 8(a)(5) by refusing to bargain over the two plan changes, namely, increasing minimum loan amount and reducing the number of simultaneous loans.  The ALJ also concluded that Exxon violated § 8(a)(1) by informing the union representative that to persist in seeking bargaining on these issues would "damage" the bargaining relationship and that any such bargaining would "begin with a blank sheet of paper."  The ALJ ordered Exxon to cease and desist from engaging in unfair labor practices and to bargain in good faith over the two changes.  However, the ALJ did not order Exxon to rescind the plan amendments, reasoning that the Exxon subsidiaries did not have the power to undo the changes--only the plan trustees or Exxon Corporation, neither of which were a party to the action, had such power.  Both the Exxon subsidiaries and the NLRB appealed the ALJ's order.

5

The NLRB adopted the ALJ's findings but ordered Exxon to rescind the plan changes. The NLRB did not address the ALJ's finding that the Exxon subsidiaries did not have the power to rescind the Thrift Plan changes, but rather simply observed that "it is the Board's customary policy to order Respondents to rescind unilateral changes and to reinstate the conditions that existed prior to the unilateral action." Member Cohen dissented in part. Although he agreed that Clements' statements violated § 8(a)(1), he disagreed that the Exxon subsidiaries had violated § 8(a)(5) by refusing to bargain over the proposed changes to the loan program. In addition, he agreed with the ALJ's refusal to order a rescission of the plan changes because the Exxon subsidiaries "have no power to rescind a change ordered by the trustees, or to compel reinstitution of a benefit under the Thrift Plan." Exxon petitioned for review of the NLRB's order, and the NLRB cross-petitioned for enforcement of its order. We have jurisdiction pursuant to 29 U.S.C. § 160(e), (f).

II.

Section 8(a)(5) of the National Labor Relations Act prohibits an "employer" from "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The NLRB found that the changes to the Thrift Plan by Exxon subsidiaries made a unilateral change in the conditions of employment by "implementing" the plan changes made by the trustees.

6

The Exxon subsidiaries challenge the NLRB's finding. Specifically, the Exxon subsidiaries contend that they did not order or implement the changes to the loan program; rather, the trustees of the plan ordered the changes. The NLRB responds that substantial evidence supports the NLRB's finding that Exxon, not the Plan trustees, violated § 8(a)(5). The NLRB points to the testimony of EUSA's chief human resources manager, James Rouse, who testified that Exxon developed and proposed the amendments to Exxon's senior management. We agree with the Exxon subsidiaries.

The NLRB's finding that the Exxon subsidiaries "implemented" the loan program changes finds no support in the record. The Thrift Plan trustees ordered several changes to the loan program. Those changes went into effect on January 1, 1993 as specified by the trustees. The NLRB does not explain what the Exxon subsidiaries did to "implement" these changes. Indeed, the record indicates that the trustees' order was sufficient to enact these changes to the loan program, and no additional action by the Exxon subsidiaries was necessary or taken.

The NLRB's reliance on Rouse' testimony is misplaced. At one point, Rouse testified that the Thrift Plan trustees simply implemented changes ordered by Exxon Corporation itself. At another point, he testified that the trustees actively designed and implemented the changes after receiving recommendations from Exxon's human resources department. Rouse's testimony, which led the ALJ to find that the trustees ordered the loan program changes after "an uncertain internal process," shows only that Exxon and

7

its subsidiaries may have played some role in the origins of the loan program changes. Rouse's testimony does not support the finding that the Exxon subsidiaries "implemented" the changes ordered by the trustees.

The difficulty in developing a remedial order to rescind the plan changes confirms the NLRB's error. The ALJ refused to order the Exxon subsidiaries to rescind the plan changes because it found that they "have no powers whatsoever to 'rescind' a change ordered by the trustee(s), nor in any other manner to compel the 'reinstitution' of a 'benefit' under the Thrift Plan itself." Rather, the ALJ explained that "[t]o achieve those kinds of results requires action by the trustee(s), or perhaps by Exxon Corporation itself, as the trustor with powers to 'amend' the Trust Declaration, and powers to remove trustees and replace them, if need be, with ones willing to effect such results." Stated bluntly, the Exxon subsidiaries could not rescind the changes because they never made them in the first place. The NLRB ignored this fundamental fact in ordering rescission of the plan changes. In short, we are persuaded that the Exxon subsidiaries took no action that constitutes a unilateral change in the conditions of employment. We emphasize that there is no contention that the Thrift Plan trustees were acting as the Exxon subsidiaries' agent. Cf. NLRB v. Truck Drivers Local Union No. 449, 728 F.2d 80 (2d Cir. 1984) (holding that union charged with an unfair labor practice resulting from the trustees implementation of a plan amendment was not responsible for the acts of the trustees since the trustees

8

were not the union's agents); <u>NLRB v. Driver Salesmen, Etc.</u>, 670 F.2d 855 (9th Cir. 1982) (holding trust was not union's agents where union did not "cause" trust to implement plan changes).

The NLRB responds that the Exxon subsidiaries' duty to bargain arose prior to the trustees' implementation of the plan amendments. Stated another way, the NLRB contends that the Exxon subsidiaries violated § 158(a)(5) by refusing to bargain over changes that they did not make but that affected their employees' conditions of employment. We disagree.

The NLRB's position would mark an unprecedented expansion of <u>NLRB v. Katz</u>, 369 U.S. 736, 743 (1962). <u>Katz</u> held that an employer that unilaterally changed its employees' conditions of employment violated § 158(a)(5); it did not hold that an employer violates § 158(a)(5) by refusing to bargain over changes made by a separate legal entity over whom the employer possesses no power. The NLRB does not cite any authority for this proposition, and we do not embrace it now. Imagine an employer who agrees to provide an on-site cafeteria for its employees by contracting with a food services company. The employer further agrees to subsidize the cafeteria by paying a fixed percentage of the cost of the food purchased by its employees. However, the employer maintains no control over the prices charged by the food services company. Under the NLRB reasoning, the employer would violate § 158(a)(5) by refusing to bargain with the union if, during the term of the collective bargaining agreement, the food services company raised

9

the price of the food.  See Ford Motor Co. v. NLRB, 441 U.S. 488, 503 (1979); id. at 505 (Blackmun, J., concurring in the result).

We hold that the record does not support the finding that the Exxon subsidiaries unilaterally changed their employees' conditions of employment.  We express no opinion whether the NLRB has the authority to regulate ERISA plan trustees.  See NLRB v. Amax Coal Co., 453 U.S. 322 (1981).[4]  Nor do we address whether the unions waived, contractually or otherwise, their right to bargain mid-term over Thrift Plan changes.  These are thorny questions best left for a case presenting them.


                              III.

Section 8(a)(1) of the National Labor Relations Act makes it unlawful for employers "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," such as the right to bargain collectively.  29 U.S.C. § 158(a)(1).  The NLRB unanimously held that the Exxon subsidiaries violated that section by threatening adverse consequences if the Unions pursued bargaining over the Thrift Plan changes.  The basis for this violation is Clements' statement to the unions at the November 17 meeting that their demands to bargain about the changes would injure the parties' bargaining relationship and that bargaining would begin with "a blank sheet of paper."

_____

    [4]    The NLRB did not attempt to assert jurisdiction over the Thrift Plan trustees here by including them in this suit.

                               10

The Exxon subsidiaries do not dispute that Clements made the statements. Rather, the companies argue that Clements' statements were not coercive when viewed in context. Specifically, they argue that while such statements may be coercive when made to rank-and-file employees in the course of a union organizing campaign, they are not unlawful when made to experienced union presidents in the context of a mature bargaining relationship. The NLRB responds that distinction is unfounded and that, if anything, Clements' statements are more coercive when made to union presidents rather than ordinary employees.

At the outset, we reject the NLRB's claim that the simple statement that bargaining will begin with "a blank sheet," by itself, constitutes an unlawful threat to engage in regressive bargaining. There are no magical phrases the mere incantation of which are coercive and therefore violate § 8(a)(1). Rather, whether a particular statement is coercive "depends upon the context in which it is uttered." TRW-United Greenfield Div. v. NLRB, 637 F.2d 410, 420 (5th Cir. 1981). "When a close question exists, '[t]he presence of contemporaneous threats or unfair labor practices is often a critical factor in determining whether there is a threatening color to the employer's remarks.'" Id. (quoting Coach & Equipment Sales Corp., 228 N.L.R.B. 440, 441 (1977)); see also Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 40 (1st Cir. 1989) (holding that those cases finding "bargaining from scratch" statements unlawful typically involved "other serious unfair labor practices").

11

We are persuaded that, placed in context, Clements' statements do not violate § 8(a)(1). As our opinion today makes clear, the statements were made in circumstances free from other unfair labor practices. In addition, there is no evidence in the record that Clements' statements were coupled with other statements or company conduct that would suggest to a reasonable audience that the companies intended to eliminate benefits before bargaining. See TRW, 637 F.2d at 421. In short, Clements' statements did not violate § 8(a)(1).

## IV.

The Exxon subsidiaries did not unilaterally change the Thrift Plan, nor did they threaten to engage in regressive bargaining if the unions persisted in their demand for bargaining.

PETITION FOR REVIEW GRANTED; ENFORCEMENT DENIED.