**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Petitioner–Appellant,**

v.

**LOCAL 2, OFFICE PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, AFL–CIO and CLC, Respondent–Appellee.**

No. 04–2274.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 30, 2005.

Decided Oct. 4, 2006.

**ARGUED:** Robert G. Ames, Venable, L.L.P., Washington, D.C., for Appellant. David Raphael Levinson, Washington, D.C., for Appellee. **ON BRIEF:** Lesley A. Pate, Venable, L.L.P., Washington, D.C., for Appellant. Martin P. Hogan, Gromfine & Taylor, P.C., Alexandria, Virginia, for Appellee.

Before WIDENER and GREGORY, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge GREGORY and Senior Judge HAMILTON concurred.

WIDENER, Circuit Judge.

The issue in this appeal is whether any part of petitioner Washington Metropolitan Area Transit Authority's closing an employee cafeteria amounted to an arbitrable withdrawal of a benefit of employment under two applicable agreements, a multi-state Compact creating the Authority and a collective bargaining agreement between the Authority and respondent Local 2, Office Professional Employees International Union. We agree with the district court that the claim was arbitrable and affirm.

I.

The Authority was created by Compact, the parties to which are Maryland, Virginia, and the District of Columbia. At a most basic level, the Authority was created

to "plan, develop, finance, and cause to be operated improved transit facilities" in the District of Columbia metro area. In connection with this mission, the Compact defines "transit facilities" broadly, as "all real and personal property ... and all equipment, fixtures, buildings, and structures and services incidental to or required in connection with the performance of transit service." The Authority is governed by a Board of Directors composed of two directors from each jurisdiction with power to "construct, acquire, own, operate, maintain, control, sell and convey [such] real and personal property," "enter into and perform contracts, leases, and agreements," and "control and regulate the use of facilities owned or controlled by the Authority." In addition to empowering the Authority and its Board, the Compact restrains it by requiring it to bargain collectively with unions representing its employees. And Article 66(c) of the Compact specifically refuses the Authority to arbitrate any labor dispute not resolved by collective bargaining. "Labor dispute" "shall be broadly construed" and is defined as "any controversy concerning wages, salaries, hours, working conditions, or benefits ... including ... the interpretation or application of such collective bargaining agreements ...."

The collective bargaining agreement at issue in this case supplements the Compact. For example, it states, in Article V, that the "Authority hereby retains the sole and exclusive control over any and all matters inherent in the operation, management, and administration of the Transit Authority including, but not limited to: the determination of the location, relocation, or termination of any or all of its operations or functions ...." Regarding labor disputes, the Agreement provides additional detail regarding arbitration procedures: Article XX, section 6 states that, as to "contract grievances," arbitral jurisdiction "shall be confined exclusively to the specific provision or provisions of the agreement at issue." And section 7 of the same Article states that, as to "disputes not covered by this agreement concerning the wages, hours, or working conditions," the parties must first try collectively bargaining—and if either party declares that no agreement has been so reached, "interest arbitration" may be invoked.

The instant dispute over these provisions was triggered by the Authority notifying the Union, on November 14, 2002, that it was going to close the cafeteria at its downtown-District of Columbia headquarters, known as the Jackson Graham Building. At the time, the cafeteria had been operating for about 30 years, though it had been closed to the public since the terrorist attacks of September 11, 2001. The Authority justified the closure in terms of its need for the space to be used for other activities of the Authority, and the former cafeteria space is now used for storage and a law library, the relocation of which allowed for expanded offices for the Authority's legal staff. The decision to close the cafeteria also was influenced by the growing number of restaurants available nearby.

From the start, the Union opposed the closure decision and insisted that it was subject to collective bargaining. Meetings on this point ensued, but the Union's demand ultimately was refused. The Authority's position was based largely on the Agreement's management rights provision, Article V. Despite this claim of management rights, during the parties' negotiations the Authority indicated a willingness to continue to negotiate the effects of its decision, and the Authority also proposed an alternative food-service canteen, which the Union rejected.

A month before the cafeteria was closed, which occurred on February 28, 2003, the Union invoked what is called "interest arbitration" under Article XX, section 7 of the Agreement. The Authority immediately moved to dismiss on the basis that its decision was not subject to interest arbitration, but only "contract arbitration," in which case the decision was privileged under Article V of the Agreement. The Arbitrator sided with the Union, holding that the dispute did not involve "workspace" and accordingly that the issue was neither inherently within the management-rights provision nor otherwise covered by the Agreement. On the contrary, the Arbitrator found that the closure amounted to a termination of a longstanding and significant employment benefit, which was subject to interest arbitration under Article XX, section 7. Though called an award, this decision did not reach the merits. Rather, it determined that the closure would be subject to a future interest arbitration if and when the collective bargaining also ordered were to be declared fruitless.

The Authority petitioned the district court to vacate the arbitral award, which the Union cross-moved to confirm. The district court confirmed the award and the Authority now appeals.

## II.

### A.

At the outset, we briefly address the Union's threshold contention that the Authority waived its right to contest arbitrability in the courts. The Union's argument rests on the doctrine that claims must be made to an arbitrator before a court will consider them. See, e.g., *Dist. 17, United Mine Workers of Am. v. Island Creek Coal Co.*, 179 F.3d 133, 140 (4th Cir.1999).

We disagree. First, the Authority argued before the Arbitrator that this was a rights arbitration case requiring a different arbitration process under a different provision of the Agreement. And, relatedly, it asserted that its decision was "privileged" under Article V. The claim of privilege can only be understood in its ordinary sense, as a claim that the Arbitrator lacked the power to address the Authority's decision. Indeed, the Arbitrator described the position of the Authority as a contention that the closure decision was "beyond the jurisdiction and power of this Board to review." We are of opinion that this contest preserved the issue for review. Absent an express agreement to submit the question of arbitrability to the Arbitrator, as here, the issue is presumed to be appropriate for judicial determination, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), which supports our considering it.

### B.

The foregoing analysis also impacts our decision about what standard of review to apply. The Authority urges *de novo* review. At first glance, this request appears to confuse the standard governing our review of the district court's conclusions with the standard for our review of the Arbitrator's decision. As the Union points out, the Supreme Court has held that courts are not to reverse arbitral decisions simply because they disagree with the interpretation of the contract in question. See *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598–99, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). But when reviewing awards that determine only arbitrability, like the one here, we have so deferred only where the parties have agreed to submit the question of arbitrability to the arbitrator. See *United States Postal Serv. v. Am. Postal*

*Workers Union, AFL–CIO,* 204 F.3d 523, 527 n. 1 (4th Cir.2000). We are directed to no such agreement here, and we do not infer one from the existence of the Agreement and Compact under which only labor disputes are arbitrable because this case presents a foundational question of what is a labor dispute. See *Champion Int'l Corp. v. United Paperworkers Int'l Union, AFL–CIO,* 168 F.3d 725, 729–30 (4th Cir. 1999) (assessing arbitrability independently). For these reasons, and to be consistent with our finding that the Authority has not waived its challenge to arbitrability, we will exercise *de novo* review. As we now discuss, the standard of review we apply is not determinative.

Both parties list two issues for our consideration: (1) whether the Arbitrator's decision that the cafeteria closure is subject to "interest arbitration" was correct, and, if so, (2) whether the Arbitrator's decision exceeded the scope of his authority. But because arbitrability depends on whether or not the cafeteria constituted an employment benefit as defined by the two governing instruments, we—like the Arbitrator—perceive little difference between these two formulations. In other words, if the Arbitrator correctly interpreted the Compact and the Agreement, he did not exceed the scope of his authority because his award determined only arbitrability. Cf. *Champion Int'l Corp.,* 168 F.3d at 730.

■   Under either formulation under either document, the fundamental question in the case is whether the cafeteria closure was a core managerial decision. On this issue the case of *Ford Motor Co. v. NLRB,* 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), is dispositive. There, the Supreme Court considered whether the company's decision to raise prices in an employee cafeteria constituted a "term[ ] and condition of employment" under the National Labor Relations Act provision which is analogous (construing 29 U.S.C. § 158(d)). In essence, the Court deferred to the NLRB's consistent position that "in-plant food prices and services are mandatory bargaining subjects"; in other words, that such things are conditions of employment. 441 U.S. at 497, 99 S.Ct. 1842. In so holding, the Court referred to the length of the employees' lunch break, 441 U.S. at 491 n. 3, 99 S.Ct. 1842, and it cited with approval a variety of NLRB decisions related to food service, 441 U.S. at 498 n. 11, 99 S.Ct. 1842. It found particularly significant that "the company is not in the business of selling food to its employees, and the establishment of in-plant food prices is not among those managerial decisions[ ] which lie at the core of entrepreneurial control." 441 U.S. at 498, 99 S.Ct. 1842 (quotation omitted). To the contrary, "[i]ncluding within § 8(d) the prices of in-plant-supplied food and beverages would . . . serve the ends of the [Act]." 441 U.S. at 498, 99 S.Ct. 1842.

The Authority's position that *Ford Motor* is inapposite is not well taken. First, while it is true that *Ford Motor* was not a decision with respect to providing such cafeteria services, 441 U.S. at 498 n. 10, 99 S.Ct. 1842, as a matter of elementary logic, if price changes to pre-existing service are subject to bargaining, then elimination of such service is also bargainable. What is more, the Authority claims that *Ford Motor* does not apply because there was no business purpose for the price hike in *Ford Motor,* whereas in this case it needed office space. We think this is a distinction without a difference. In any case, the cafeteria price-hike at issue in *Ford Motor* had just such a purpose: avoiding payments the company was contractually obligated to make to the cafeteria vendor when cafeteria revenues fell below a certain level. 441 U.S. at 492 n. 4, 99 S.Ct. 1842. In all events, that a decision has a

business purpose does not automatically remove it from the realm of collective bargaining; a host of profit-motivated business decisions are nevertheless traditionally subject to collective bargaining. See *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 224, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring) ("Compulsory retirement, layoffs according to seniority, assignment of work among potentially eligible groups within the plant ... all have been recognized as subjects of compulsory collective bargaining."). Stated otherwise, it is the nature of the business purpose and its relationship to the fundamentals of the business that control, not merely the existence of a business purpose.

Consequently, the Authority's argument that *First National Maintenance* is instead the dispositive decision is not well taken. To begin with, *First National Maintenance* is not contrary to *Ford Motor*, as the Authority argues; on the contrary, the decisions interpreting *First National Maintenance* appear to be confined to major operational changes: for example, see *Arrow Auto. Indus., Inc. v. NLRB*, 853 F.2d 223, 225–32 (4th Cir.1988) (plant closure); and *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 841–44 (4th Cir.2000) (plant relocation). Simply put, *Ford Motor*, on the one hand, and *First National Maintenance*, on the other, deal with different categories of labor problems.

We thus are of opinion that closing a cafeteria, even for a legitimate business purpose, is unlike closing a plant or operational division, and we so hold.

Lastly, the Authority contends that the arbitrator's decision exceeded its authority. The argument, perhaps a little oversimplified, remains that the closing of the cafeteria is governed by Article V of the WMATA Compact, which gives WMATA authority over real property issues and

that this is a real property issue. The district court carefully examined this question. It found that the arbitrator correctly "found that the decision to close the cafeteria was a 'decision to terminate a working condition that has been a longstanding past practice.' " It held that in *Ford Motor Company*, the Court "held that food service at work is a matter affecting 'conditions of employment.' " We agree with the district court and hold that *Ford Motor Company* controls in this case.

The judgment of the district court is accordingly

*AFFIRMED.*