[No. C054725. Third Dist. Feb. 28, 2008.]

CALIFORNIA FACULTY ASSOCIATION, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, Real Party in
Interest.                                          .

COUNSEL

Rothner, Segall & Greenstone, Glenn Rothner, Emma Leheny, Jonathan Cohen; and Bernhard Rohrbacher for Petitioner.

Tami R. Bogert, Wendi L. Ross and Sean M. McKee for Respondent.

Liebert Cassidy Whitmore, Bruce A. Barsook, Michael C. Blacher; Christine Helwick and Donald A. Newman for Real Party in Interest.

## OPINION

**ROBIE, J.**—Petitioner California Faculty Association (the association), which is the exclusive bargaining representative for certain employees of the California State University (the university), complained to the Public Employment Relations Board (the board) that the university committed an unfair labor practice when it excluded members of the association's bargaining unit from parking in newly built parking structures on the Northridge and Sacramento campuses of the university without first giving the association an opportunity to bargain over the issue. Rejecting a proposed decision by an administrative law judge (ALJ) to the contrary, the board concluded the university had not committed an unfair labor practice because the university had no "duty to bargain a change of parking location." The board based this conclusion on the determination that "parking location does not involve the 'employment relationship.'"

On writ review of the board's decision, we conclude that the terms and conditions on which the university provides parking to its employees—including where the employees are allowed to park—do involve the employment relationship between the university and its employees, and the board's determination to the contrary is clearly erroneous. Accordingly, we will set aside the board's decision and direct the board to conduct further proceedings to determine whether the association established the remaining elements of its unfair labor practice charge.

## FACTUAL AND PROCEDURAL BACKGROUND

The association is the exclusive bargaining representative of employees of the university in bargaining unit 3, which consists of faculty, coaches, academic counselors, and librarians. Although they have not historically negotiated parking location, the association and the university have historically negotiated parking fees. In fact, the collective bargaining agreement for the period from May 14, 2002, to June 30, 2004, contained a provision in the "Benefits" section (art. 32) governing parking fees. Under that provision, employees were "required to pay the parking fees as determined by the [university] for parking at any facility of the [university]." The agreement also provided, however, that " 'faculty will not be required to pay parking fees in excess of those applicable as of June 30, 2001 during the 2001–2002, 2002–2003 contract years.' "

Parking at each of the university's campuses is a self-supporting function, which means the campuses receive no general funds to cover the costs of constructing and operating parking facilities; instead, at each campus those costs must be paid from parking fees generated at the campus.

As of the 2000–2001 school year, employees at the Northridge and Sacramento campuses paid the same amount for their parking permits as the students at those campuses. At Northridge, parking lots were designated either for faculty and staff or for students, but faculty and staff could park in either type of lot. At Sacramento, a similar practice had been followed since around 1991 or 1992. Prior to that, faculty and staff could not park in student lots.

During the 2000–2001 school year, administrators at both the Northridge and Sacramento campuses determined additional campus parking structures were needed and that, to pay for these new structures, parking fees would need to be raised. The university requested that the association reopen the collective bargaining agreement to negotiate the issue of raising employee parking fees at the Northridge and Sacramento campuses, but the association refused.

At Northridge, the university negotiated with and obtained a parking fee increase for employees in various bargaining units not represented by the association. Accordingly, beginning in September 2001, the university raised parking fees for students and those employees who had agreed to parking fee increases. At Sacramento, the university raised student parking fees at the beginning of the fall 2002 semester but left employee fees unchanged. At the same time, however, the university designated the new parking structure (parking structure II) on the Sacramento campus as parking for students only.

In October 2002, the association filed an unfair practice charge with the board alleging that by excluding employees from parking in the new structure, the university had "effectively changed the Sacramento State parking fee structure by de-valuing faculty parking permits sold at the contractually permissible rate and limiting the use of said permits in violation of previous practices on campus." The association asserted that this was a violation of subdivision (c) of Government Code section 3571, which makes it unlawful for a higher education employer like the university to "[r]efuse or fail to engage in meeting and conferring with an exclusive representative."

The board issued a complaint on the association's charge in December 2002. Meanwhile, in March 2003, the university informed the association that the members of its bargaining unit at Northridge would not be permitted to park in the new parking structure (parking structure B-5) on that campus when it was completed in the fall. In April 2003, the association filed an amended charge adding allegations relating to Northridge to its allegations relating to Sacramento. The board issued an amended complaint in September 2003.

In July 2004, an ALJ issued a proposed decision concluding that when the university unilaterally prohibited employees from parking in the new parking structures, the university violated Government Code section 3571, subdivision (c). In reaching that conclusion, the ALJ concluded, among other things, that the issue of parking location is a matter within the association's scope of representation.

Two and one-half years later, in December 2006, the board declined to adopt the ALJ's proposed decision on this issue and instead concluded that the issue of parking location is *not* a matter within the scope of representation and therefore the university did not have a duty to bargain with the association regarding that issue.[1]

---

[1] The board's decision also addressed other charges that are not at issue before this court. We express no opinion about those aspects of the decision.

In January 2007, the association filed a petition with this court for a writ of review of the board's decision. Following briefing, this court issued the writ in October 2007.

## DISCUSSION

### I

### *The Role of the Board*

Labor relations between the university and the exclusive bargaining representatives of its employees (like the association) are governed by the provisions of the Higher Education Employer-Employee Relations Act (HEERA) (Gov. Code, § 3560 et seq.). Government Code section 3570 requires the university, as a higher education employer, to "engage in meeting and conferring with the employee organization selected as exclusive representative of an appropriate unit on all matters within the scope of representation," and Government Code section 3571, subdivision (c) makes it unlawful for the university to fail or refuse to do so. With respect to the university (and with certain exceptions not applicable here), " 'scope of representation' means, and is limited to, wages, hours of employment, and other terms and conditions of employment." (Gov. Code, § 3562, subd. (r)(1).)

"An employer's unilateral change in terms and conditions of employment within the scope of representation is, absent a valid defense, a per se refusal to negotiate and a violation of HEERA." (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 934 [59 Cal.Rptr.2d 488].) Under board precedent, "to prevail on a complaint of illegal unilateral change, the [charging party] must establish: (1) the employer breached or altered the parties' written agreement, or own established past practice; (2) such action was taken without giving the exclusive representative notice or an opportunity to bargain over the change; (3) the change is not merely an isolated breach of the contract, but amounts to a change of policy, i.e., the change has a generalized effect or continuing impact on bargaining unit members' terms and conditions of employment; and (4) the change in policy concerns a matter within the scope of representation." (*Id.* at p. 935.)

The board is specifically empowered under HEERA to "determine in disputed cases whether a particular item is within or without the scope of representation." (Gov. Code, § 3563, subd. (b).) "Interpretation of the statutory provision defining scope of representation thus falls squarely within [the board]'s legislatively designated field of expertise. Under established principles [the board]'s construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally

be followed unless it is clearly erroneous." (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523].)

The primary question here is whether the university's unilateral decision to preclude employees from parking in the new structures at Northridge and Sacramento, when they had previously been allowed to park in all areas designated for students, concerned the "terms and conditions of employment."[2] Under board precedent, "[a] subject is within the scope of representation" "as a 'term or condition of employment' " "if: (1) it involves the employment relationship; (2) is of such concern to both management and employees that conflict is likely to occur and the mediatory influence of collective bargaining is an appropriate means of resolving the conflict; and (3) the employer's obligation to negotiate would not unduly abridge its freedom to exercise those managerial prerogatives (including matters of fundamental policy) essential to the achievement of the employer's mission." (*Academic Professionals of California v. Trustees of the California State University* (2003) PERB Dec. No. 1507-H [27 PERC ¶ 26, p. 147].)

## II

### *The Board's Decision*

Since we must give deference to the board's determination of whether a particular subject is within the scope of representation and follow that determination unless it is clearly erroneous (*San Mateo City School Dist. v. Public Employment Relations Bd., supra,* 33 Cal.3d at p. 856), we begin with the analysis from the board's decision. Essentially, the board determined that the university's exclusion of employees from the new parking structures did not "involve the 'employment relationship' " because "[p]arking at both locations is not a condition of employment. Employees are not required to drive to work. However, in the event they choose to drive, the employees are not limited to permitted spaces. They may, like student and members of the public, park in 'daily use' spaces rather than permitted spaces or, alternatively, park off campus." The board bolstered its analysis by noting that "faculty were permitted to park in the same areas as they did prior to the opening of the new parking structures. Moreover, the number of spaces available to the faculty actually increased at both campuses when the respective structures opened." The board stopped short, however, of concluding that "parking location" can *never* be deemed a matter within the scope of

---

[2] The board concluded that "the decision to restrict the faculty from parking at these locations had no impact on the wages of the employees" and was "not logically and reasonably related to hours of employment." The association does not challenge these conclusions.

representation under HEERA. In a footnote, the board stated that parking location might "be deemed to impact the employment relationship" "under certain circumstances"—"[f]or example, . . . if parking was moved to a location that created significant health and safety risks." In the board's view, a change of that sort "might be found to impact the conditions of employment."

## III

*The Board's Decision Was Clearly Erroneous*

The association takes issue with the board's determination that the change at issue here did not "involve the employment relationship" because employees are not required to drive to work and if they choose to drive they are not limited to permitted spaces. According to the association, the board previously rejected this " 'captive consumer—no reasonable alternative' " test in another case involving employee parking—*Statewide University Police Association v. Regents of the University of California* (1983) PERB Dec. No. 356-H [7 PERC ¶ 14288, p. 1155] (*Regents*)—and therefore the board's decision here is contrary to its own precedent.

Before we discuss the board's decision in the *Regents* case, however, it is necessary to briefly discuss an underlying decision of the United States Supreme Court that played a substantial role in that case—*Ford Motor Co. v. NLRB* (1979) 441 U.S. 488 [60 L.Ed.2d 420, 99 S.Ct. 1842] (*Ford*).

The *Ford* case involved the question of "whether prices for in-plant cafeteria and vending machine food and beverages are 'terms and conditions of employment' subject to mandatory collective bargaining under . . . the National Labor Relations Act." (*Ford, supra,* 441 U.S. at p. 490 [60 L.Ed.2d at p. 424].) The National Labor Relations Board (NLRB) had concluded that in-plant food prices and services were subject to mandatory collective bargaining (*id.* at pp. 494–495, 497 [60 L.Ed.2d at pp. 426, 428]), and the Supreme Court agreed. In reaching this conclusion, the Supreme Court offered the following explanation: "It is not suggested by petitioner that an employee should work a full 8-hour shift without stopping to eat. It reasonably follows that the availability of food during working hours and the conditions under which it is to be consumed are matters of deep concern to workers, and one need not strain to consider them to be among those 'conditions' of employment that should be subject to the mutual duty to bargain. By the same token, where the employer has chosen, apparently in his own interest, to make available a system of in-plant feeding facilities for his employees, the prices at which food is offered and other aspects of this service may reasonably be considered among those subjects about which

management and union must bargain. The terms and conditions under which food is available on the job are plainly germane to the 'working environment.' " (*Id.* at p. 498 [60 L.Ed.2d at pp. 428–429], fn. omitted.)

With this understanding of the *Ford* case in mind, we turn to the board's decision in the *Regents* case. In that case, the board concluded that the University of California (UC) had violated Government Code section 3571, subdivision (c) (among others) "by refusing to negotiate and by unilaterally raising the fees paid by its police officer employees for parking in lots operated by UC." (*Regents, supra*, PERB Dec. No. 356-H [7 PERC ¶ 14288, p. 1155].) First, "For the reasons set forth in the ALJ's decision," the board "affirm[ed] the [ALJ's] finding that the amount of fees charged to employees for employer-provided parking is a matter within the scope of representation under HEERA." (*Id.* at p. 1156.) In that decision, taking heed of the *Ford* case, the ALJ drew an "analogy between increases in in-plant food prices and increases in parking fees." The ALJ explained that "[t]he availability of parking and its costs are matters of concern to employees" and "[t]erms and conditions under which parking is available [are] plainly germane to working conditions."[3]

After affirming the ALJ's finding that parking fees are within the scope of representation under HEERA, the board went on to reject a number of arguments advanced by UC, including one aimed at defeating the analogy between the parking fees at issue there and the food prices at issue in *Ford.* According to UC, "the parking fees . . . [we]re not a term or condition of employment since alternative modes of transportation exist for employees" and "this differentiates parking fees from the food service costs at issue before the U.S. Supreme Court in" *Ford.* (*Regents, supra*, PERB Dec. No. 356-H [7 PERC ¶ 14288, p. 1157].) The board rejected this argument based on the following reasoning: "In [*Ford*], the Supreme Court *did* point out that, in the plant in question, there appeared to be no reasonable alternative to the company cafeteria.[4] However, it did *not* indicate that the NLRB's consistent holding that '. . . in-plant food prices are among those terms and conditions of employment . . . about which the employer must

---

[3] The board in the *Regents* case specifically stated that it was "attach[ing]" and "incorporat[ing] by reference herein" the ALJ's decision "insofar as" that decision was "consistent with the [board's] discussion." (*Regents, supra*, PERB Dec. No. 356-H [7 PERC ¶ 14288, p. 1155].) Unfortunately, the ALJ's decision is *not* attached to the board's decision in the Public Employee Reporter for California (PERC). It *is* attached to the board's decision that can be found on the board's Web site—(<http://www.perb.ca.gov/decisionbank/pdfs/0356H.pdf> [as of Feb. 28, 2008].)

[4] In the recitation of the facts in *Ford,* the Supreme Court had explained that it was "difficult for employees to eat away from the plant during their shifts" because "[t]he lunch period is 30 minutes, and the few restaurants in the vicinity are all over a mile away, in an area heavily saturated with industrial plants employing thousands of workers." (*Ford, supra*, 441 U.S. at p. 491, fn. 3 [60 L.Ed.2d at p. 424].) The court also noted that while "[s]ome workers bring

bargain . . .' would *only* be affirmed in those cases in which it was shown that there existed no reasonable alternative to in-house culinary services, and in which employees were thus 'captive consumers' of such services. Rather, it cited with approval a series of NLRB cases in which the 'captive consumer—no reasonable alternative' situation did not exist." (*Ibid.*) Thus, the board found in the *Regents* case "that the amount of fees charged to employees for employer-provided parking is a subject within the scope of representation under HEERA, whether or not alternative methods of commuting are available to employees." (*Ibid.*)

The association argues that "[t]he analysis employed [by the board] here—placing reliance on the fact that employees are not required to drive to work or use permitted parking spaces—is identical to the 'captive consumer—no reasonable alternative' rationale [the board] rejected in *Regents*." The association contends that the board's "failure to follow its own precedent warrants reversal."

In response to the association's argument, the board offers no explanation for its retreat from the position it took in the *Regents* case. Instead, now advocating the distinction it rejected in that case, the board argues the *Ford* case "is factually distinguishable from the present case" because "[t]he employees in *Ford* who did not want to purchase cafeteria food did not have any feasible alternatives" whereas here employees "retained access to the same parking locations available to them before the construction of the new parking structures," "could park in 'daily use' locations and off campus," and "were also free to walk, bicycle, carpool, or take mass transit to work."

As the board explained in the *Regents* case, however, the fact that the employees in *Ford* could be considered "captive consumers" of in-plant food, while noted by the Supreme Court in its opinion, played no part in the court's decision. Instead, the court concluded that "the availability of food during working hours and the conditions under which it is to be consumed" were "among those 'conditions' of employment that should be subject to the mutual duty to bargain" because they were "matters of deep concern to workers" and are "plainly germane to the 'working environment.' " (*Ford, supra*, 441 U.S. at p. 498 [60 L.Ed.2d at pp. 428–429].) Notably, the Supreme Court did not limit these statements to workers who may be deemed "captive consumers" of employer-provided food services. Instead, as the board noted in the *Regents* case, the Supreme Court "cited with approval a series of NLRB cases in which the 'captive consumer—no reasonable alternative' situation did not exist." (*Regents, supra*, PERB Dec. No. 356-H [7 PERC ¶ 14288, p. 1157].) Thus, the essence of the court's decision in *Ford* was that

food to work," "[n]o refrigerated storage facilities are provided, . . . and spoilage and vermin are a problem, particularly in the summer." (*Ibid.*)

where an employer chooses to provide food to its employees, the terms and conditions on which the employer makes that food available are part of the terms and conditions of employment for purposes of mandatory collective bargaining, regardless of whether an employee has other food options available. Consequently, the "captive consumer—no reasonable alternative" issue is a red herring, and the board's attempt to distinguish the *Ford* case from this case on that basis fails.

The board also attempts to distinguish *Ford* by arguing that food and parking are "vastly different." The board observes that "parking in a preferred location is obviously not required to sustain life. Nor is it even required for employees to work." According to the board, this distinction means that "parking [unlike food] is simply not an integral part of the employee's relationship with his or her employer."

Once again, however, the board is deviating from its own precedents without explanation. As we have noted, under the board's own precedents the test for whether "[a] subject is within the scope of representation" as concerning " 'term[s] or condition[s] of employment' " begins with determining whether that subject "involves the employment relationship." (*Academic Professionals of California v. Trustees of the California State University,* *supra,* PERB Dec. No. 1507-H [27 PERC ¶ 26, p. 147].) The board cites no authority for the proposition that a subject must be *integral* to the employment relationship before it can be deemed to *involve* that relationship. The question here is not whether food and parking are of equal importance to maintaining human life, or even of equal importance to an employer's relationship with its employees; the question is whether the terms and conditions on which an employer chooses to provide parking to its employees (like the terms and conditions on which it chooses to provide food) "involve the employment relationship."

■ The answer to that question is obvious. Just as the terms and conditions on which an employer makes food available for its employees are germane to the working environment, so are the terms and conditions on which an employer makes parking available. Indeed, the availability of parking may have a significant impact on whether an employee can get to work in the first place. As the Supreme Court of Illinois recently explained in a case involving employer-provided parking under that state's labor laws, "The integral role that adequate parking plays in any employee's ability to get to the workplace in a timely manner and to perform daily duties without outside disruption due to parking factors is self-evident." (*Board of Trustees v.* *ILRB* (2007) 224 Ill.2d 88, 102 [308 Ill.Dec. 741, 862 N.E.2d 944, 953].)

The fact that driving (unlike eating) is not a necessity of life—and that employees are not required to drive to work, not required to park on campus

if they do drive, and not required to park in permitted spaces if they do park on campus—makes no difference to whether the terms and conditions on which the university provides parking to its employees "involve the employment relationship." As the board recognized in the *Regents* case, but lost sight of here, "[t]he availability of parking and its costs are matters of concern to employees" and "[t]erms and conditions under which parking is available [are] plainly germane to working conditions."[5] Indeed, the fact that the amount of fees employees pay for parking on campus is expressly dealt with as a *benefit* of employment in the collective bargaining agreement between the university and the association supports the commonsense conclusion that employer-provided parking is a subject that "involves the employment relationship."

■ For the foregoing reasons, we find the board's conclusion that "parking location does not involve the 'employment relationship' " clearly erroneous. Under well-established precedent, the terms and conditions on which an employer makes parking available to its employees "involves the employment relationship."

■ Of course, our conclusion that employer-provided parking involves the employment relationship does not, by itself, mean the board should have sustained the charge that the university violated Government Code section 3571, subdivision (c) by excluding employees from the new parking structures without giving the association an opportunity to bargain over the issue. As we have previously noted, a party complaining of an illegal unilateral change "must establish: (1) the employer breached or altered the parties' written agreement, or own established past practice; (2) such action was taken without giving the exclusive representative notice or an opportunity to bargain over the change; (3) the change is not merely an isolated breach of the contract, but amounts to a change of policy, i.e., the change has a generalized effect or continuing impact on bargaining unit members' terms and conditions of employment; and (4) the change in policy concerns a matter within the scope of representation." (*California State Employees' Assn. v. Public Employment Relations Bd., supra*, 51 Cal.App.4th at p. 935.) Furthermore, the determination of this last element—whether a subject is within the scope of representation as concerning "terms and conditions of employment"—itself involves a three-part test, only one part of which— whether the subject involves the employment relationship—has been resolved here. For a matter to be within the scope of representation it must also be determined that the matter is "of such concern to both management and employees that conflict is likely to occur and the mediatory influence of collective bargaining is an appropriate means of resolving the conflict; and [that] the employer's obligation to negotiate would not unduly abridge its

---

[5] See footnote 3, *ante.*

freedom to exercise those managerial prerogatives (including matters of fundamental policy) essential to the achievement of the employer's mission." (*Academic Professionals of California v. Trustees of the California State University, supra*, PERB Dec. No. 1507-H [27 PERC ¶ 26, p. 147].) Unfortunately, the board declined to reach any of these other elements of a charge of illegal unilateral change because it put all of its eggs in one basket and found the one element we have addressed dispositive.

In varying levels of detail, the parties argue some of these other elements in their briefs. In our view, however, the board should determine in the first instance whether the association established any or all of the remaining elements of a charge of illegal unilateral change. As we have noted, the board is specifically empowered under HEERA to "determine in disputed cases whether a particular item is within or without the scope of representation." (Gov. Code, § 3563, subd. (b).) The board is likewise empowered to "investigate unfair practice charges or alleged violations of [HEERA], and to take any action and make any determinations in respect of these charges or alleged violations as the board deems necessary to effectuate the policies of [HEERA]." (Gov. Code, § 3563, subd. (h).) Furthermore, when it exercises these powers, "The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive." (Gov. Code, § 3564, subd. (c).)

Here, the board has yet to determine whether (1) the terms and conditions of university-provided parking are of such concern to both management and labor that conflict is likely to occur and the mediatory influence of collective negotiations is an appropriate means of resolving the conflict; (2) the university's obligation to negotiate regarding the terms and conditions on which it provides parking would not unduly abridge its freedom to exercise those managerial prerogatives (including matters of fundamental policy) essential to the achievement of the university's mission; (3) the university breached or altered the parties' written agreement, or its own established past practice, by excluding employees from the new parking structures (given that the employees, unlike students, were not paying increased fees to help cover the cost of construction of the new facilities); (4) such action was taken without giving the association notice or an opportunity to bargain over the change; and (5) the change is not merely an isolated breach of the contract, but amounts to a change of policy. These questions involve factual determinations and judgments that the Legislature has given the board the power and the responsibility to decide in the first instance, with this court exercising only the discretionary power to review the board's decision by extraordinary writ. (See Gov. Code, §§ 3563, 3564, subd. (c).) Under these circumstances, we decline to address any of the other elements of the association's charge and instead leave the initial determination of those matters to the board.

## DISPOSITION

To the extent the board dismissed the association's charge that the university violated HEERA when it prohibited employees from parking in newly built parking structures, the board's decision is set aside, and the board is directed to conduct further proceedings on that charge consistent with this opinion. Petitioner shall recover its costs. (Cal. Rules of Court, rule 8.490(m).)

Morrison, Acting P. J., and Butz, J., concurred.