[No. G040106. Fourth Dist., Div. Three. Jan. 5, 2009.]

CALIFORNIA TEACHERS ASSOCIATION, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
JOURNEY CHARTER SCHOOL, Real Party in Interest.

---

COUNSEL

Rosalind Wolf; Joseph R. Colton and Priscilla Winslow for Petitioner.

Tami R. Bogert, General Counsel, Wendi L. Ross, Deputy General Counsel, and Valerie P. Racho, Regional Attorney, for Respondent.

Kronick, Moskovitz, Tiedemann & Girard, Christian M. Keiner and Chelsea Olson for Real Party in Interest.

---

OPINION

**BEDSWORTH, Acting P. J.**—The California Teachers Association (CTA) petitions for review of an order of the Public Employment Relations Board (PERB or the Board) which dismissed its own complaint against real party in interest Journey Charter School (Journey).[1] The complaint stemmed from CTA's charge that Journey had violated the Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.), when it terminated the employment of three teachers: Stephanie Edwards, Paola Schouten and Marlene Nicholas.

CTA had initially charged the terminations were in retaliation for the teachers' efforts to unionize with it, and amounted to illegal interference with those efforts. After PERB determined the charge stated a prima facie case, it issued a complaint, which was later amended to include the additional allegation that Journey's conduct had also been in retaliation for a letter the teachers had sent to parents of Journey students.

However, after an evidentiary hearing before an administrative law judge (ALJ), and a review of his findings by the Board, PERB issued a decision dismissing the complaint. That dismissal was based upon the Board's factual conclusion the terminations had not been based upon the CTA unionization efforts, but were instead prompted solely by the letter sent to parents. The Board then concluded the letter did not qualify as protected activity under the EERA, and thus the terminations were not actionable.

---

[1] Government Code section 3542, subdivision (b), provides that "Any charging party . . . aggrieved by a final decision or order of the board in an unfair practice case, except a decision of the board not to issue a complaint in such a case, may petition for a writ of extraordinary relief from such decision or order." Such a petition is properly filed "in the district court of appeal in the appellate district where the unit determination or unfair practice dispute occurred." (Gov. Code, § 3542, subd. (c).)

CTA now argues (1) the evidence is insufficient to support the Board's factual determination that the teachers' unionizing efforts with the CTA had *not* been the cause of their terminations; and (2) PERB erred in concluding the letter, which it believed was the cause, did not amount to protected conduct. We conclude the second claim has merit.[2] PERB's determination the teachers' letter did not amount to protected activity cannot be reconciled with its own precedent cited in support of that determination, and thus its decision to dismiss the complaint was clearly erroneous.

## FACTS

Journey is a charter school begun in 1985 as a private co-op preschool run by Edwards out of her home. Schouten joined the school in 1999, and the two women wrote the school's charter. Journey's charter was approved by the Capistrano Unified School District in 2001, at which point Journey became part of the district.

Journey is modeled on the "Waldorf method" of education, which emphasizes arts and music, and has a "collaborative structure of governance involving teachers, parents, and management."[3] As explained in Journey's brief to this court, "Charter schools are different from regular K-12 schools in that a charter school which does not retain parents and students literally goes out of business. . . . Administrators, teachers, parents, and students in charter schools are involved in the creative exercise of redefining education." As a consequence, "Journey's *Waldorf Methods instruction to students and parents* innovates in many collegial ways, including having teachers serve as directors on the governing School Council."

Journey's governing council, which includes both parent and teacher representatives, has responsibility for all school operations, including hiring and firing of employees, and reports to the district. The teacher members of

---

[2] CTA has requested we take judicial notice of (1) two decisions issued by ALJ's in cases brought under PERB's jurisdiction, and (2) the text of an Assembly bill, which CTA contends is presently "awaiting action by the Governor." We deny the request, as CTA has argued only that we "may" take judicial notice of the documents, but made no effort to explain why we might wish to do so. With respect to the ALJ decisions, we note that California Code of Regulations, title 8, section 32320, subdivision (c) provides only that "[a]ll decisions and orders *issued by the Board itself* are precedential and may be cited in any matter pending before a Board agent or the Board itself." (Italics added.) It does not include ALJ decisions as among those with precedential value, and CTA has not otherwise explained how those ALJ decisions might be entitled to our consideration in evaluating the Board's decision herein. With respect to the Assembly bill, until it is passed into law, we cannot see how it might impact our decision herein, and CTA has failed to offer any suggestion in that regard.

[3] Journey is sometimes also referred to as a "Steiner school," after Rudolf Steiner, the man who first devised the Waldorf educational model.

the council were referred to at various times as "Lead Teachers" or "Directors," and were paid a stipend in addition to their teacher's salary as compensation for participation on the council.

By the 2003–2004 school year, Journey had a total staff of about 15 to 18, including 10 teachers, and served students ranging from kindergarten to sixth grade. Both Edwards and Schouten were teachers as well as members of Journey's council, while Nicholas was a teacher only. In March of 2004, the district's deputy superintendent informed the council that Journey's charter was no longer acceptable and would have to be rewritten. Some of the parents became concerned about the future of the school and expressed those concerns in the form of complaints about Edwards and Schouten.

In April of 2004, the council held a special meeting to discuss the issues raised. In the course of that meeting, the council decided to remove Edwards and Schouten as council members, but to retain them as teachers. When word of that decision spread among the teachers the following morning, there was some disruption of the schoolday, and the council scheduled a teachers' meeting at lunchtime to explain the decision. The decision also caused dissension in the wider Journey community, including the parents of Journey students.

A community meeting was held in late April, during which parents voiced their strongly held—and diametrically opposing—opinions regarding the propriety of removing Edwards and Schouten from the council. Nicholas spoke out strongly in favor of Edwards and Schouten, and ultimately stated to one parent that if the discord continued, she "wonder[ed] how much longer before we have another Columbine." That remark offended several parents, and Nicholas later sent a letter of apology to the council, parents, and Journey staff.

At a council meeting in mid-May, one member made a motion to terminate Edwards's and Schouten's employment as teachers at Journey, but the motion was not seconded. Instead, the council ultimately passed a motion to reinstate Edwards and Schouten to the council, on the condition they participate in mediation with other members of the council and staff.

Meanwhile, having become concerned about her own position and that of the other teachers employed at Journey, Edwards contacted CTA, which arranged for a meeting between the teachers and one of its organizers on the day following the mid-May council meeting.

During June and July, Edwards, Schouten, and other council members participated in mediation. The mediator suggested a reorganization of Journey's governing structure, including the formation of new committees which would report to the council. Although Edwards and Schouten solicited teachers to participate in the committees, some of the teachers viewed that participation as amounting to additional duties and were reluctant to agree. Schouten informed one of the other council members in June that the teachers were "going to organize."

On June 13, the mediator sent an e-mail to council members, seeking approval to send a letter he had written for distribution to the Journey community. In the letter, the mediator proposed a restructuring of Journey's governance, and stated that Edwards and Schouten had resigned their positions on the council. The letter also asserted that in the future all "official communication" from Journey would contain a statement that it was "approved by Journey faculty and Council." However, some of the council members objected to distribution of the letter absent written resignations from the council by both Edwards and Schouten. And while it is undisputed that Edwards and Schouten had resigned from the council no later than June 26, 2004, the last day of the school year, they had apparently never been asked to put those resignations in writing. The proposed letter was never approved by the council for distribution.

On that last day of the school year, the teachers had an informal meeting with two of the nonteacher members of the council. During that meeting, teachers expressed their concern about the impact the proposed new committees would have on their workload. One of the teachers, who was also a newly appointed member of the council, stated the workload concern was the reason the teachers needed to join CTA.

On July 26, 2004, all of the teachers met at Edwards's home, and collectively drafted the following letter to the parents of Journey students (the July 26 letter):

"Dear Parents of Journey School,

"This letter by the teacher faculty at Journey School is intended to communicate directly to you some of the issues that have been weighing heavily on our hearts and minds. We are aware and sensitive to the honest concerns that some of the parents have expressed concerning their frustration with some aspects of the parent-teacher relationship and operations of Journey School. The teaching faculty is open and committed to these efforts of dialogue and mediation for resolving issues.

"The teacher faculty, along with the parents, has been committed to the students' educational welfare from the very inception of the school. The record shows that even with 'growing pains', Journey School had been a flourishing and financially sound place where the children were thriving.

"The teachers have believed that continual acrimony on certain issues was unnecessary and unhealthy for the welfare of the children and the school. This was the reason that the teaching Directors decided to take a hiatus while mediation was in process and had not taken any legal recourse.

"We have been seriously concerned with the financial and executive management course that the school has taken since April 21, 2004. It is our belief at this point that the Council's financial and management decisions are putting the school at serious legal and financial risk of insolvency. These issues pale in comparison to the possible non-renewal of the charter by the district. We have serious concerns over the financial, executive management and accountability of the school for the following reasons:

"• Repeated violations of the Brown Act (by failure to properly agendize items for meetings and improper postings of agendas) and continuing to ignore the school's legal council [*sic*] opinion on conducting the council meetings within the boundaries of the law.

"• Accessing of confidential student files by Council members.

"• Prior to April 21, Journey School was financially sound with a balanced budget of more than $1,000,000 in revenue and $300,000 in savings. Currently, the school is facing a $311,000 shortfall that has been exacerbated by an enrollment decrease of 30%.

"• The hiring of a consultant despite Journey School's policies to put the contract up for competitive bidding. This consultant was initially hired for the mediation process, but has now been directed to run the school's operations, despite the school's growing budget crisis.

"• Lack of follow up on solid leads in procuring a site in San Clemente.

"This management approach is not in accordance with the spirit of Steiner's model. We are open to meeting with any parent or parents directly and discussing and resolving the issues.

"We do not feel that the current political climate is serving the best interests of the children, the parents, or the community. We do not want any part of a political power struggle; we want dialogue, cooperation, and balance and a truly model education environment for the children to exist and thrive. We agree that there are areas within the school where we could have done a better job, which is something we want to examine and improve upon. However, we do not think that this gives current Council a license to compromise the educational welfare of the children to serve political ends. Our experience with Council's management has brought us to the conclusion that there is little interest in a collaborative, open, and transparent model, which ultimately impacts the viability of the school.

"In closing, our reports are nearing completion and our summer training was inspiring and uplifting. We are looking forward to moving into the future where the vision and integrity of Journey School's promise to deliver a quality Waldorf education will not be compromised. We ask for your help and commitment towards the goal of a healthy Steiner school."

The letter ended with the names of all the teachers, who had unanimously agreed to send it out.[4] The letter was duplicated on plain paper, and mailed to parents in Journey's envelopes.

The letter angered some parents, including the parent members of the council. Those parent members apparently believed the letter had been conceived and written by Edwards and Schouten, and that the other teachers had not given their "full consent." There was also concern the teachers had violated the new communications policy—apparently the one set forth by the mediator in his draft letter that had itself never been approved by the council for distribution—by sending the letter directly to parents.

At some point in July, the mediator apparently renounced that role and signed a contract to become an administrator at Journey. On August 10, the teachers met again with a representative of the CTA, and voted to become part of the district's faculty bargaining union. When the former mediator/administrator was informed the teachers were meeting with the CTA, he questioned the suitability of CTA to represent the Journey teachers, remarking on their unique "work ethic," which required availability outside of school hours.

---

[4] One of the teachers apparently regretted the letter shortly after signing it, but she did not dispute the fact she had initially supported it.

On August 17, the nonteacher members of Journey's council went into closed session to discuss teacher contracts. They voted not to renew the contracts of Edwards and Schouten, despite the mediator/administrator's recommendation they should be retained as teachers but not directors, and voted not to renew Nicholas's contract.

Schouten was told her contract had not been renewed because, as no seventh grade curriculum had yet been approved, there was no teaching position available for her. Edwards was told her contract had not been renewed because she "no longer fit in" at Journey. Nicholas was given no explanation for her termination, but one of the parent members of the council later testified that her Columbine remark had been inappropriate, and her attitude generally hostile after the April 2004 community meeting.

On October 25, 2004, CTA filed an unfair practice charge against Journey with PERB, alleging that all three teachers had been terminated because of their involvement with CTA. PERB's general counsel concluded that the allegations of the charge demonstrated a prima facie case of wrongful interference with employee rights protected by the EERA, and retaliation against them for exercising those rights. Consequently, PERB issued a complaint.

In September of 2005, a five-day hearing was held before an ALJ. During that hearing, CTA was granted permission to amend its charge and the complaint, to allege that Journey's termination decision had also been in retaliation for the three teachers' involvement with the July 26 letter.

In January of 2006, the ALJ issued a proposed decision sustaining, for the most part, CTA's charges. The ALJ concluded that while Journey was not legally responsible for comments made by the mediator which had allegedly interfered with the teachers' exercise of their right to organize under the EERA, it had acted improperly by terminating their employment in retaliation for both their protected efforts to unionize with the CTA and their protected conduct of creating and sending the July 26 letter. Specifically, the ALJ concluded that either of those protected acts, standing alone, would have caused the terminations: "If the teaching staff had not expressed interest in CTA, the contracts of the three teachers would still not have been renewed because of the July 26 letter, and if that letter had not been sent, their contracts would still not have been renewed because of the CTA."

Journey filed a statement of exceptions to the proposed decision with PERB. After conducting its own review of the record and the ALJ's proposed decision, the Board concluded that decision could not be sustained. First, the Board rejected the ALJ's conclusion there was a nexus between the teachers' efforts to unionize and their termination. Although the Board expressly deferred to the ALJ's credibility determination that the council's parent members had been aware of the unionizing effort (despite their denials), a majority nonetheless concluded there was insufficient evidence to support the inference of a nexus between that knowledge and the decision to terminate these teachers.[5]

Among other things, the Board majority noted there was no evidence that any representative of Journey "had ever tried to frustrate, thwart or discourage [the CTA unionization] attempt. For example Ware [a pro-union teacher] who testified about informing the Council of the teachers' organizing efforts, was not subjected to any adverse action. Further, when the teachers held their first meeting with [the CTA representative] in a [Journey] classroom on May 12, the Council took no action to prevent it."

Second, while the Board agreed with the ALJ's factual determination that the employment terminations were based on the July 26 letter, it disagreed with the ALJ's legal conclusion the letter amounted to a "protected act" under the EERA. The Board noted that " '[p]reliminarily, the speech must be related to matters of legitimate concern to the employees as employees so as to come within the right to participate in the activities of an employee organization for the purpose of representation on matters of employer-employee relations.' " (Quoting *Rancho Santiago Community College District* (Dec. 30, 1986) PERB Dec. No. 602, p. 12.) And while the Board acknowledged that (1) materials "which did not directly address disputed issues at the bargaining table or in negotiating proposals," could nonetheless qualify as " 'comments on matters which were of legitimate concern to the teachers as employees' " (Quoting *Mt. San Antonio Community College District* (June 30, 1982) PERB Dec. No. 224, p. 7, fn. omitted); and (2) that " '[c]riticism of a supervisor on employment-related subjects is protected under the Act when its purpose is to advance the employees' interests in working conditions,' " (Quoting *Regents of the University of California* (Dec. 4, 1984) PERB Dec. No. 449-H, p. 143), the July 26 letter did not meet the test. "In the present case, contents of the letter to parents did not directly address any issue relating to the teachers'

---

[5] The review was conducted by a three-member panel of the Board. One member dissented from the conclusion there was no nexus between the unionizing effort and the terminations.

interests as employees. The teachers expressed their concerns for the operations of the school, welfare of the children, financial and executive management of the school, possible non-renewal of the charter, hiring of the consultant, and complained that the management approach was not in accordance with the spirit of Waldorf model. . . . However, the teachers did not state how all those complaints impacted their working conditions, or how these concerns would advance their interests as employees. Without such evidence, the Board cannot make any inference of protected activity."

In light of its factual conclusion the employment terminations in this case had not been based upon the protected CTA contacts, as well as its legal conclusion the July 26 letter—which did prompt the terminations—did not qualify as a protected act, the Board determined that CTA had failed to sustain its burden of proving Journey had discriminated or retaliated against Edwards, Schouten or Nicholas based upon activity protected by the EERA. It consequently dismissed the charge and complaint against Journey.

## I

"PERB is an expert, quasi-judicial administrative agency" (*City and County of San Francisco v. International Union of Operating Engineers, Local 39* (2007) 151 Cal.App.4th 938, 943 [60 Cal.Rptr.3d 516]). PERB's board members are "appointed by the Governor by and with the advice and consent of the Senate," and it operates independently of any state agency. (Gov. Code, § 3541, subd. (a).) "PERB has a specialized and focused task—'to protect both employees and the state employer from violations of the organizational and collective bargaining rights . . . .' " (*Banning Teachers Assn. v. Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804 [244 Cal.Rptr. 671, 750 P.2d 313], quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 198 [172 Cal.Rptr. 487, 624 P.2d 1215].) "As such, PERB is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' " (*Banning Teachers Assn.*, at p. 804, quoting *Universal Camera Corp. v. Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 71 S.Ct. 456].)

When a party files a statement of exceptions to an ALJ's proposed decision, the Board reviews the record de novo, and is empowered to reweigh the evidence and draw its own factual conclusions. Although the Board generally gives deference to the ALJ's credibility determinations, which may be based on considerations such as witness demeanor (*Beverly Hills Unified*

*School Dist* (1990) PERB Dec. No. 789 [14 PERC ¶ 21042]), it is not bound by the ALJ's evaluation of the weight to be given to disputed evidence. "[T]he [Board], not the hearing officer, is the ultimate fact finder, entitled to draw inferences from the available evidence." (*McPherson v. Public Employment Relations Bd.* (1987) 189 Cal.App.3d 293, 304 [234 Cal.Rptr. 428]; Cal. Code Regs., tit. 8, § 32320, subd. (a)(1).)

Once the matter reaches us, we have "only appellate, as opposed to original, jurisdiction to review PERB's decisions." (*International Federation of Prof. & Technical Engineers v. Bunch* (1995) 40 Cal.App.4th 670, 677 [46 Cal.Rptr.2d 813]; see Gov. Code, § 3509.5.) As a consequence, we must affirm the Board's factual determinations if supported by substantial evidence. " 'Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold the Board's decision if it is supported by substantial evidence on the whole record. [Citations.]' " (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617 [224 Cal.Rptr. 631, 715 P.2d 590], quoting *Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756–757 [195 Cal.Rptr. 651, 670 P.2d 305].) However, one of the issues we consider on review is whether PERB followed its own precedents in reaching its decision. (*California Faculty Assn. v. Public Employment Relations Bd.* (2008) 160 Cal.App.4th 609 [72 Cal.Rptr.3d 654].) With those principles in mind, we turn to CTA's arguments.

## II

What CTA has charged in this case is that Edwards, Schouten and Nicholas were terminated from their teaching positions at Journey in retaliation for (1) their efforts to unionize Journey's teachers with the CTA; and (2) their promotion and participation in the teachers' creation and dissemination of the July 26 letter. Because PERB expressly concluded that the terminations *were based* upon the letter, we turn first to the issue of whether PERB correctly determined the letter did not amount to protected activity under the EERA.

■ Government Code section 3543, subdivision (a), provides in pertinent part that "Public school employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." Government Code section 3543.5, subdivision (a) makes it unlawful for an employer to "[i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."

Those provisions of the EERA are expressly made applicable to charter schools such as Journey by Education Code section 47611.5, subdivision (a), and "[t]he Public Employment Relations Board shall take into account the Charter Schools Act of 1992 (Part 26.8 (commencing with Section 47600)) when deciding cases brought before it related to charter schools." (Ed. Code, § 47611.5, subd. (d).)

The CTA asserts that the July 26 letter, which was produced and disseminated with the approval of all of Journey's teachers, qualifies as a protected act under the EERA because its content related to the teachers' interests as employees, which is the standard articulated in PERB's own precedents.

In reaching its contrary conclusion, the Board relied on *Rancho Santiago Community College District, supra,* PERB Decision No. 602, *Mt. San Antonio Community College District, supra,* PERB Decision No. 224, and *Regents of the University of California, supra,* PERB Decision No. 449-H. However, each of those cases is distinguishable from this one in two important ways: First, none of those cases involved a writing produced by a teacher in a charter school, and thus none of them considers the possibility that such a teacher might have a different scope of issues that legitimately relate to their "interests as employees," than would the average public school teacher. In this case specifically, all the parties have taken pains to explain how the Waldorf model, followed by Journey, specifically "entails . . . a collaborative structure of governance involving teachers, parents and management," and how charter schools require "[a]dministrators, teachers, parents and students" to be "involved in the creative exercise of redefining education."

As set forth in Education Code section 47601, subdivision (d), an express part of the legislative intent in creating the Charter Schools Act of 1992 (Ed. Code, § 47600) was to "[c]reate new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the schoolsite." And as noted above, PERB is expressly required to take those unique goals into account "when deciding cases brought before it related to charter schools." (Ed. Code, § 47611.5, subd. (d).)

Here, there is no indication PERB considered the unique role played by the teachers in a charter school, and specifically the collaborative role these particular teachers were expected to play at Journey, when it decided the July 26 letter did not qualify as a protected act under the EERA. It is undisputed that at the time the letter was written and distributed, Journey was experiencing significant upheaval, with something of a rift growing between the parent members of the council and the teaching staff. The council, dominated by

those parent members, had either implemented, or was considering implementing, a policy that purported to prohibit the teachers from communicating directly with the wider community of Journey parents in an "official" capacity. Instead, according to the policy, all "official communications" from Journey were to be approved by the council.

That communications policy, whether actually in effect or not, appeared to be an obvious effort to restrict the influence of the teachers, and a significant departure from the rather expansive role the teachers had formerly been expected to play in shaping school policy. Among other issues, the July 26 letter expressed that concern, noting the teachers' collective belief that the current council was not managing the school "in accordance with the spirit of Steiner's model," and had "little interest in a collaborative, open, and transparent model." The letter acknowledged the "frustration" expressed by some parents concerning "aspects of the *parent-teacher relationship* and operations of Journey School," (italics added) and included an offer by the teachers to "meet[] with any parent or parents directly and discuss[] and resolve[] the issues."

Even assuming that complaints about the management structure of a school might not be viewed as addressing "the teachers' interests *as employees*" in a traditional public school, it is difficult to conclude they do not do so in this case—or perhaps in any case involving a charter school.

The second problem with the Board's reliance on *Rancho Santiago Community College District, Mt. San Antonio Community College District*, and *Regents of the University of California*, is that none of those cases addressed how the EERA applies to communications that actually *embody* a protected effort at organizing. In contrast to each of those cases relied upon by the Board in this case—in which the communications expressed or distributed by individual employees were analyzed to ascertain whether the *content* of that communication addressed protected subject matter—the July 26 letter in this case was actually the culmination of an effort to *organize* Journey's teachers for the purpose of protecting their collective interests as teachers and expressing their unique perspective about the tumultuous events unfolding at the school.

Significantly, the letter did not merely reflect the communication of one, or even a percentage of Journey's teachers; instead, it was created through the collaborative effort of *all* those teachers, and contained the signatures of every single one. And while the record in this case included evidence that *one teacher* had expressed second thoughts about her support of the letter shortly after it was created, there is no evidence that she, or any other teacher, actually failed to support it originally.

And yet, only three teachers were fired because of the July 26 letter. Indeed, the parent members of the council made clear that they chose to fire these particular teachers, but none of the other teachers who participated in and supported its drafting and dissemination, because they viewed these three teachers as having been chiefly responsible for *organizing* the other teachers and persuading them to collaborate on the letter.

The EERA does not merely protect teachers' efforts to participate in an *existing* employee organization, such as the CTA, for "representation on all matters of employer-employee relations," but also explicitly protects their efforts to *"form"* such an organization. (Gov. Code, § 3543, subd. (a), italics added.) Here, it is difficult to view the efforts of the three teachers who brought about the July 26 letter as anything other than a nascent effort at forming such an organization. And while the Journey teachers ultimately decided to join CTA rather than rely on their own employee organization, that decision was not made until after the July 26 letter. Consequently, viewing the July 26 letter as the embodiment of an organizing effort is in no way inconsistent with the teachers' ultimate decision to organize through CTA.

So if these teachers were fired for their efforts at organizing their fellow teachers—for persuading those other teachers to express and support a unified message about their collective concerns about the management's policy changes at Journey—we cannot perceive that as anything but a violation of the EERA.

But finally, even if we leave aside the concerns that PERB (1) failed to consider the unique role of teachers in a charter school—and specifically the role of the teachers at Journey—in evaluating whether the content of the July 26 letter addressed their concerns "as teachers," and thus whether its dissemination was a protected act; and (2) failed to grapple with the fact that the three teachers were purportedly fired for their effort at organizing their fellow teachers, rather than for their mere participation in the communication itself, we must still conclude the letter's content is protected under PERB precedent.

In *Mt. San Antonio Community College District*, which is not only cited by PERB in its decision herein, but is characterized by PERB as one of the two "leading PERB decision[s] in this area," two teachers were disciplined for distributing leaflets at the school's graduation (apparently drafted by their employee association). The *Mt. San Antonio* opinion characterized the overall content of the leaflet as "critical of the District's fiscal management." (*Id.* at p. 3.) As PERB explained in the opinion, "the leaflet distributed at the graduation ceremony touts the college as the finest in the land and expresses the hope that the public will help prevent deterioration in the quality of the product. The appeal is not . . . to urge the public to turn away from the

college, but rather, *to bring attention to the plight of the college, allegedly endangered by bad management, and to work for the preservation of the college's high educational quality. . . .* [¶] We therefore find that the Association's allegations, *while not directly addressing issues in dispute at the bargaining table nor in the form of negotiating proposals, were nonetheless their comments on matters which were of legitimate concern to teachers as employees.*" (*Id.* at pp. 6–7, fn. omitted, italics added.)

We simply cannot distinguish PERB's description of what it concluded were "protected" criticisms of financial mismanagement in *Mt. San Antonio* from the sort of concerns the teachers in this case communicated to the Journey parents in their July 26 letter. Just as with the leaflet in *Mt. San Antonio*, the July 26 letter criticized Journey's administration for apparent fiscal mismanagement which the teachers believed had left the school at "risk of insolvency"—as well as for other failures which the teachers believed were compromising the school's unique spirit—while at the same time expressing their own continuing commitment to the school. If such issues of *schoolwide impact* were considered to be of legitimate concern to the teachers *as employees* in *Mt. San Antonio*, we cannot imagine how they could not also be considered of such concern here.

Moreover, we cannot reconcile PERB's statement that in order to qualify as protected activity, the July 26 letter in this case was required to expressly "state *how* all those complaints impacted [the teachers'] working conditions, or *how* these concerns *would advance their interests as employees*" (italics added) with its determination that the leaflet in *Mt. San Antonio* was protected. What the leaflet in that case did, specifically, was question certain expenditures by the district in the wake of California's Proposition 13, including those for (1) administrators' own salaries; (2) the purchase of a phone system; (3) the hiring of hourly consultants to assist in negotiating contracts with the faculty; and (4) the construction of a new track for the college.

There is nothing in the *Mt. San Antonio* leaflet that expressly ties any of those expenditures to any interests or concerns of the teachers specifically. Instead, much like the July 26 letter in this case, the leaflet is consistent in its expression of concern *for the school as a whole*, rather than for the teachers specifically. The closest the leaflet comes to addressing any issue specific to the teachers is in its criticism of the expenditure for hourly consultants to assist in negotiations with the faculty members; but even there, the only specified lament is that those consultants, by virtue of their being paid by the hour, have an incentive to "stall negotiations and *make more money*."

(*Mt. San Antonio Community College Dist.*, PERB Dec. No. 224, ALJ proposed decision, appen. A, p. 30, italics added.) And while it is true that stalled negotiations might cause specific harm to the teachers themselves (although it also might not), no such contention is *expressly* made in the leaflet; instead, the teachers' principal concern, viewed in the context of the leaflet's overall theme of fiscal mismanagement, would seem to be the perceived ability of the consultants to cause further *waste of school funds*.

Yet even in the absence of any express assertion of harm or direct impact to the teachers in the *Mt. San Antonio* leaflet, PERB was nonetheless willing to draw the obvious inference that the teachers—as teachers—had a legitimate interest in protecting both the quality of the college and its fiscal health. In this case, by contrast, PERB took the position that unless the teachers themselves spelled out that interest, "the Board *cannot make* any inference of protected activity." We disagree. Because the Board had no problem doing so in *Mt. San Antonio*, it should have done so in the instant case as well.

Journey argues *Mt. San Antonio* is distinguishable because PERB's opinion in that case "noted . . . the leaflets distributed by employees at a graduation ceremony 'specifically mentioned *negotiations with the faculty*, which was a topic of wide publication in the community.' " But that statement, which is actually taken from the ALJ's conclusions of law, rather than the PERB decision itself, is made in the context of refuting the assertion that the leaflet merely "disparages" the district, and is thus unprotected as a purely "disloyal" activity.[6] (*Mt. San Antonio Community College Dist., supra*, PERB Dec. No. 224, ALJ proposed decision, pp. 14–15.) Nothing in that passage of the ALJ's proposed decision, or in the opinion of PERB itself, suggests the determination that the leaflet "comments on matters which were of legitimate concern to teachers as employees" turned on its mere mention of "negotiations with the faculty," as Journey suggests. Close analysis of the opinion, including PERB's own characterization of the leaflet's content as concerning the district's "fiscal management," leaves us unpersuaded by Journey's argument.

Because PERB's analysis of the July 26 letter in this case cannot be reconciled with its own precedent in *Mt. San Antonio*, we conclude its determination that the dissemination of the letter does not qualify as protected conduct was clearly erroneous and thus that its order dismissing the complaint must be reversed.

---

[6] PERB's *Mt. San Antonio* decision states that it "adopts" the ALJ's procedural history and finding of fact as its own, and "affirms" the ALJ's conclusions of law "insofar as they are consistent" with its own written decision. (*Mt. San Antonio Community College Dist., supra*, PERB Dec. No. 224, pp. 2–3.) This problematic approach greatly complicates the task of deciphering PERB's decision.

In light of that conclusion, we need not reach CTA's separate contention that PERB also erred in its factual determination that the teachers' terminations were not caused by their efforts to unionize with the CTA. PERB's determination that the terminations *were* caused by the July 26 letter, coupled with our conclusion the letter was clearly protected under PERB's precedents, establishes that the teachers were terminated in violation of the EERA. We thus remand the case to PERB for further proceedings, including a disposition consistent with this opinion.

Moore, J., and Ikola, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 15, 2009, S170608.