NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240109-U

FILED
August 15, 2025
Carla Bender
4th District Appellate
Court, IL

NO. 4-24-0109

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| GOVERNORS STATE UNIVERSITY, | ) | Direct Review from the |
| Petitioner, | ) | Illinois Educational Labor |
| v. | ) | Relations Board |
| THE ILLINOIS EDUCATIONAL LABOR | ) | No. 2020-CA-0041-C |
| RELATIONS BOARD and THE UNIVERSITY | ) | |
| PROFESSIONALS OF ILLINOIS, LOCAL 4100, IFT- | ) | |
| AFT, AFL-CIO, | ) | |
| Respondents. | ) | |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The Illinois Educational Labor Relations Board (Board) clearly erred in finding
Governors State University (University) committed an unfair labor practice by
failing to bargain over a change to its tuition and fee waiver policy where the
evidence did not support the Board's conclusion the University made a unilateral
change to the policy.

¶ 2     In November 2019, the University Professionals of Illinois, Local 4100, IFT-AFT,

AFL-CIO (Union), filed a charge with the Illinois Educational Labor Relations Board (Board)

against Governors State University (University), alleging the University committed an unfair

labor practice when it unilaterally terminated its reciprocal tuition and fee waiver policy without

bargaining with the Union, in violation of section 14(a)(5) of the Illinois Educational Labor

Relations Act (Act) (115 ILCS 5/14(a)(5) (West 2018)). After a hearing, an administrative law

judge (ALJ) made factual findings and issued a recommended decision and order (RDO), finding

the University violated the Act when it altered the status quo with regard to its tuition and fee

waiver policy without bargaining in good faith with the Union. The University filed exceptions to the ALJ's RDO, and the Board affirmed. On appeal to this court, the University argues it did not commit an unfair labor practice because it did not unilaterally make a change to its reciprocal tuition and fee waiver policy; rather, the termination of the policy was the result of actions by third parties over which the University had no control. We reverse the Board's decision, holding the Board's conclusion the University made a unilateral change to a mandatory subject of bargaining was clearly erroneous.

¶ 3                                  I. BACKGROUND

¶ 4        The Union is the exclusive bargaining agent for academic and academic support employees of the University. On November 27, 2019, the Union filed an unfair labor practice charge against the University, alleging the University committed an unfair labor practice within the meaning of section 14(a)(5) of the Act (115 ILCS 5/14(a)(5) (West 2018)), by unilaterally terminating its reciprocal tuition and fee waiver policy without notice to the Union or an opportunity to bargain about the termination. The University had a policy, in cooperation with a number of participating universities, to allow its employees to complete some classes, with the tuition and fees waived. Although the executive director of the Board initially concluded there was no evidence the University played a role in the other universities' decisions to deny tuition waivers and recommended dismissal of the charge, the Board found there were unresolved questions of fact regarding the element of control over the other universities' decisions. Thus, the Board reversed the executive director's recommended decision and order and remanded the matter for the issuance of a complaint and a notice of hearing. Thereafter, the executive director issued a complaint, and a hearing was held before the ALJ on May 2 and 6, 2022.

¶ 5                            A. Hearing Before the ALJ

¶ 6        Nichole Dalaly testified she had been employed by the University since April 2018, originally as a recruiting specialist and later as an academic advisor, both noncivil service positions at the University. The Union was her bargaining agent. Dalaly was informed, prior to accepting a position with the University, the University had a tuition and fee waiver policy that allowed her to take classes at other universities. The policy was important to her decision to accept the position with the University. Dalaly identified the University's tuition and fee waiver policy as it was printed on the University's website as an employee benefit in 2019:

> "Employee Tuition Waiver—Permanent status employees may enroll in any university previously a part of the Board of Governors system for a maximum of two courses, or six credit hours, whichever is greater, in any one academic term with exemption from the payment of tuition and fees ([University], Northeastern Illinois University, Northern Illinois University [(NIU)] and Chicago State University [(CSU)]). Civil Service Tuition and fee waivers shall be granted by each state university in Illinois to status Civil Service employees of the University (BOT p. 29-30)."

¶ 7        Dalaly identified "BOT" as referring to the University's regulations. The regulations contained a provision for tuition reduction benefits. Governors State University Board of Trustees Regulations § II.A.18 (Regulations) (amended Oct. 12, 2018). Section II.A.18.b of the Regulations states the specific benefits are described in section II.B.5.f of the Regulations for faculty and administrative employees (page 18 of the Regulations) and in section II.C.7.g of the Regulations for civil service employees (pages 29 and 30 of the Regulations). Section II.A.18.c of the Regulations, entitled "Benefit Administration," provides: "The Board of Trustees of [the University], in its sole discretion, reserves the right to amend, change or

terminate the benefits under this program." Section II.B.5.f of the Regulations tracks the University's website language and provides:

"An employee may enroll in any university previously a part of the Board of Governors system for a maximum of two courses, or six credit hours, whichever is greater, in any one academic term with exemption from the payment of tuition and fees. The fees which will be waived by such universities include registration, application fees, credit evaluation fees, admission fees, activity fees, graduation fees, and textbook rental fees. In addition, service fees, such as those imposed to secure revenue for bond retirement, will be waived by such universities for an employee of the university granting the waiver." *Id.* § II.B.5.f.i.

¶ 8        In April 2019, Dalaly submitted a completed tuition waiver form to the University's human resources department for classes at NIU. Thereafter, Dalaly enrolled at NIU, but, in June 2019, she observed she still had a balance due and her tuition was not waived in accordance with the University's policy. Dalaly approached the human resources representative with the University and was informed she did not qualify for a waiver as a noncivil-service employee. In July 2019, at a grievance meeting with the University, Dalaly was informed NIU was no longer accepting the tuition and fee waivers. Dalaly withdrew from the program at NIU and has not enrolled in another PhD program.

¶ 9        Paula McMullen McMahon (McMullen) testified she is a graduate advisor at the University, and she had been employed by the University for almost 15 years. Her position is a noncivil service position at the University, and she is represented by the Union. McMullen had successfully been granted tuition waivers by NIU in 2010 and 2014. McMullen sought to enroll in another PhD program at NIU in 2019, and she submitted a tuition waiver form to the human

resources department at the University in the spring of 2019. Like Dalaly, in June 2019, McMullen noted her invoice from NIU did not reflect the waiver of tuition and fees. Despite initial e-mail correspondence from NIU stating NIU was still accepting tuition and fee waivers from the University, McMullen was ultimately informed the benefit was no longer available. McMullen withdrew from the classes at NIU. As McMullen believed CSU was still accepting the tuition and fee waivers, McMullen applied to a master's degree program there, which began in the spring of 2020. At the time of the hearing, McMullen had completed 7 of the 13 courses required for the program. However, she did not receive any tuition and fee waivers for her classes at CSU, and she paid out-of-pocket for those courses.

¶ 10 Stacy Amedeo testified she began working for the University in 2011 as an academic advisor, a noncivil service position represented by the Union. In 2019, while still in that position, she sought to avail herself of the tuition and fee waiver benefit and applied to a PhD program at NIU. Like Dalaly and McMullen, Amedeo initially received e-mail correspondence indicating NIU was still accepting waivers, but her waiver was never granted, and Amedeo withdrew from NIU when her balance remained due a week before the start of classes. In 2020, Amedeo accepted a civil service position with the University. After a one-year probation period in the new position, Amedeo applied for and was accepted into the NIU program she had sought to begin in 2019. She anticipated starting in the fall of 2022, utilizing the tuition and fee waivers provided to civil service employees.

¶ 11 The University presented one witness, Sandra Alvarado Marak, its director of human resources. Marak testified she was responsible for the operations team in the human resources department, which was responsible for processing tuition and fee waivers. In the spring of 2019, Marak was informed there was confusion regarding noncivil service employee

reciprocal tuition and fee waivers at NIU. Marak identified a document provided by the University indicating the University had approved various tuition and fee waivers for its employees to attend classes at NIU through the spring 2019 semester. Marak was not aware if NIU had granted any waivers; the document indicated waivers had been approved by the University, but Marak did not have access to individual employee tuition records at other universities. In June 2019, Marak reached out to NIU to determine if NIU would continue to accept tuition and fee waivers for noncivil service University employees. Marak was informed NIU would no longer accept such waivers, including the three University employee waivers which had recently been approved and processed by the University.

¶ 12　　　　　Prior to the summer of 2019, if Marak's office received reciprocal tuition and fee waivers from NIU employees, the University granted them. Marak believed there was a long-standing practice between the University and other universities, including NIU, CSU, Northeastern University, and the University of Illinois, to grant reciprocal tuition and fee waivers to noncivil service employees. After the e-mail exchange with NIU in June 2019, Marak's office reached out to CSU and Northeastern University to determine if they would continue the practice. Each indicated they would no longer grant the reciprocal tuition and fee waivers to the University's noncivil service employees. Thus, the University also ceased granting reciprocal tuition and fee waivers to noncivil service employees from the other universities.

¶ 13　　　　　Marak testified there was no exchange of money with the tuition and fee waiver benefit; the attending university waived the fees. Marak was also involved in the collective bargaining agreement meetings with the Union, which resulted in the 2019-22 collective bargaining agreement (CBA). Marak identified section 31.5(a) of the CBA, which provided, unchanged from the 2016-19 CBA:

"A full-time Employee may enroll for credit at the University for a maximum of two courses, or six credit hours, whichever is greater, in any one Academic Term with exemption from payment of tuition and fees."

¶ 14    To Marak's knowledge, the availability of tuition and fee waivers for noncivil service employees to attend other universities was never discussed at the collective bargaining meetings.

¶ 15                           B. The ALJ's RDO

¶ 16    After the completion of the hearing and the submission of posthearing briefs, the ALJ entered her RDO. The ALJ identified the primary dispute between the Union and the University as whether the University unilaterally changed the terms and conditions of its tuition and fee waiver policy for noncivil service employees, resulting in an unfair labor practice. The ALJ made findings of fact based upon the testimony and documentary evidence in the record. The ALJ found the Regulations had provisions for tuition and fee waiver benefits, and the Regulations provided that the Board of Trustees reserved the right to amend, change, or terminate the tuition waiver benefits. The provision applicable to noncivil services employees stated such employees may enroll in any university previously part of the Board of Governors system for a maximum of two courses, or six credit hours, in any one academic term with exemption from the payment of tuition and fees. The University's webpage under Human Resources Employee Benefits stated the same information but also contained a parenthetical listing of the universities subject to the benefit: the University, Northeastern Illinois University, CSU, and NIU. Article 31 of the CBA, applicable to noncivil service employees, provides the same two courses or six credit hours exemption from tuition and fees but only states it is applicable to courses at the University.

¶ 17         The ALJ found, prior to the spring of 2019, NIU and other participating universities accepted and granted tuition and fee waivers received from the University. In the spring of 2019, three noncivil service employees of the University, Dalaly, McMullen, and Amedeo, sought to avail themselves of the tuition and fee waiver benefit to attend NIU. In accordance with prior practice, the University processed and approved those waivers and forwarded them to NIU for NIU to honor and grant the tuition and fee waivers. After some confusion and e-mail exchanges, a representative at NIU informed the University that NIU would no longer accept interinstitutional tuition and fee waivers for noncivil service employees.

¶ 18         After the parties were unable to resolve the matter informally, the Union demanded to bargain the termination of the tuition and fee waiver. The issue was not raised during negotiations for the parties' successor CBA, which was tentatively agreed to in November 2019.

¶ 19         The ALJ, citing *Vienna School District No. 55 v. Illinois Educational Labor Relations Board*, 162 Ill. App. 3d 503 (1987), noted an educational employer violates section 14(a)(5) of the Act when it makes a unilateral change to a term or condition of employment that deals with a mandatory subject of bargaining without giving the applicable union notice and opportunity to bargain over the change. In determining whether the tuition and fee waiver policy was a term or condition of employment, since it was not provided for in the CBA, the ALJ looked at the past practices and determined there was a *de facto* agreement with the other universities to provide reciprocal tuition and fee waivers. Even if the waivers were being applied in error, the record supported a finding of the existence of a status quo. The ALJ found Marak had approval authority, albeit only on the front end of the process, but that authority inferred and attached a degree of obligation. Also, the Regulations, including the University's reservation of

the right to amend, change, or terminate the benefits, supported this finding of approval authority. Although there was no express reciprocal agreement and the benefit was not provided in the CBA applicable to noncivil service employees, the University's Regulations and website implied the University was facilitating and assenting to a reciprocal interinstitutional tuition and fee waiver policy. The noncivil service employees had a reasonable expectation the tuition and fee waiver benefit was an established status quo and their waivers would be accepted and approved by the University and waived at the respective attending universities. The University had a degree of administration and operation in the matter, so the cessation of the benefit should be attributed to the University.

¶ 20        The ALJ concluded the University violated section 14(a)(5) of the Act, and derivatively, subsection (a)(1) of the Act (115 ILCS 5/14(a)(1) (West 2018)), when it altered the status quo and made a unilateral change to a term or condition of employment that was a mandatory subject of bargaining without bargaining in good faith with the Union.

¶ 21        As a secondary issue, the University argued, even if it had a mandatory duty to bargain regarding the tuition and fee waiver policy, the Union waived its opportunity to bargain by not raising the issue during the parties' negotiations for a successor agreement. The ALJ rejected the University's argument, finding the record did not support a clear and unmistakable waiver by the Union. The ALJ recommended the University cease and desist, restore the status quo, and make the adversely affected employees whole. The University filed exceptions to the ALJ's RDO.

¶ 22                    C. The Board's Opinion and Order

¶ 23        The Board upheld the ALJ's decision, adopting the ALJ's findings of fact. It identified the University's exceptions as falling into two categories: (1) the University did not

make a unilateral change to deny tuition waivers and (2) the Union waived its right to bargain regarding tuition waivers. The Board began by reiterating an educational employer violates section 14(a)(5) of the Act when it unilaterally changes the status quo involving a mandatory subject of bargaining. Relying on *Pay 'N Save Corp. d/b/a Lamont's Apparel*, 268 NLRB 1332 (1984), and *Ford Motor Co. v. National Labor Relations Board*, 441 U.S. 488, 503 (1979), the Board agreed the evidence supported a finding the University made a unilateral change to a mandatory subject of bargaining. The Board held, even accepting the University's argument the decision to discontinue tuition and fee waivers was made by the other universities, the University had the potential leverage to exert some control over the other universities' actions by likewise ceasing to grant the reciprocal tuition waivers at the University. This leverage and control were further evidenced by the University's regulations and webpage, which both advertised the interinstitutional tuition waivers as a benefit of employment. The Board also affirmed the ALJ's conclusion the Union did not waive its right to bargain regarding the tuition and fee waivers. The University was ordered to cease and desist from refusing to bargain collectively and in good faith with the Union and from making unilateral changes to any term or condition of employment without prior bargaining to an agreement or impasse. The University was also ordered to take any affirmative action necessary to effectuate the policies of the Act, including restoring the status quo and making whole any Union employees for any losses incurred because of the University's unilateral change. The Board specified the make whole remedy was limited to reimbursement for out-of-pocket tuition costs and fees, with interest, but did not include additional losses, such as loss of time or salary.

¶ 24　　　　The University appealed directly to this court. See 115 ILCS 5/16(a) (West 2024) ("[J]udicial review shall be taken directly to the Appellate Court of a judicial district in which the

Board maintains an office.").

¶ 25                                   II. ANALYSIS

¶ 26          The University contends the Board erred in holding the University violated the Act by failing to bargain regarding the reciprocal tuition and fee waiver policy because the University did not take any action to terminate the policy. Rather, the University contends, to the extent the policy changed, such change was due to the actions of the other universities. The University continued to process the tuition and fee waiver applications in accordance with its past practice, and it was not involved in the other universities' decisions to deny the waivers. The University had no influence or control over the decisions of the other universities, so bargaining over changes made by the other universities would be futile. Thus, the other universities' decisions to deny the tuition and fee waivers did not create in the University a mandatory duty to bargain with the Union regarding the reciprocal tuition and fee waiver policy. The University acknowledges there was a prior practice of granting reciprocal tuition and fee waivers to noncivil service employees among the universities who were formerly part of the Board of Governors of State Colleges and Universities and NIU (formerly part of the Board of Regents, but was included in the reciprocal waivers) but contends the practice was simply a gratuitous benefit. On appeal to this court, the University does not challenge the Board's finding the Union did not waive its right to bargain over the tuition waivers.

¶ 27          The Union contends granting reciprocal tuition and fee waiver benefits to employees of several other universities was the status quo, so the University had a duty to bargain in good faith to change the status quo. The University's change in its policy to restrict tuition and fee waiver benefits to classes taken at the University was a unilateral change to the terms and conditions of employment and was a mandatory subject of bargaining. The Union

- 11 -

argues the Board's conclusion the University had control over the cessation of the benefit was not clearly erroneous.

¶ 28                                    A. Standard of Review

¶ 29          The parties dispute the applicable standard of review, so we begin by addressing and determining the appropriate standard of review to apply in this case. This appeal comes before us to review an order of an administrative agency, the Board, which is responsible for administering and enforcing the Act. 115 ILCS 5/5 (West 2022). Pursuant to the Act, judicial review of an order of the Board must be in accordance with the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)). 115 ILCS 5/16(a) (West 2022). The Administrative Review Law provides judicial review "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2022). "The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001).

¶ 30          Findings of fact by an administrative agency are entitled to deference and are deemed "*prima facie* true and correct." 735 ILCS 5/3-110 (West 2022). A reviewing court is limited to reviewing factual findings to determine if those findings are against the manifest weight of the evidence. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). At the other end of the spectrum, in terms of deference on review, are an administrative agency's determinations on questions of law. Those determinations are not afforded deference and are reviewed *de novo* by the reviewing court. *Id.* When the issue presented involves the application of particular facts to the law, it is not solely one of fact and

not solely one of law, and, rather, is a mixed question of law and fact subject to a clearly erroneous standard of review. *Id.*

¶ 31    The University argues this is purely a question of law, as the case turns on the Board's misinterpretation of the Act, so our review is *de novo*. The Union contends the clearly erroneous standard applies, as the issue is a mixed question of law and fact. We agree the clearly erroneous standard of review applies in this case. The Board made factual findings regarding the past reciprocal tuition and fee waiver practice and the University's level of control over the granting of the waivers. The Board's conclusion, however, turns on the legal application of those facts to the language of the Act and the prior case law interpreting the Act. As such, it is a mixed question of law and fact subject to the clearly erroneous standard of review. A Board's decision is clearly erroneous if, despite being supported by some evidence, the reviewing court is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 32                              B. Unfair Labor Practice

¶ 33    The Board held the University committed an unfair labor practice when it unilaterally terminated its reciprocal tuition and fee waiver policy without bargaining in good faith with the Union. This was deemed a violation of section 14(a)(5) of the Act and, derivatively, section 14(a)(1) of the Act. Section 14(a) of the Act provides it shall be an unfair labor practice and educational employers are prohibited from:

"(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.

* * *

- 13 -

(5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit." 115 ILCS 5/14(a)(1), (5) (West 2018).

¶ 34        An educational employer commits an unfair labor practice when it refuses to bargain collectively in good faith regarding a change in a term or condition of employment that is subject to mandatory bargaining. *Vienna School District No. 55*, 162 Ill. App. 3d at 506. "A term or condition of employment is something provided by an employer which intimately and directly affects the work and welfare of the employees." *Id.* at 507. The obligation to bargain in good faith is violated when the employer "makes a unilateral change in a mandatory subject of bargaining without granting notice and an opportunity to bargain with its employees' exclusive bargaining representative." *Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board, Local Panel*, 2017 IL App (1st) 160999, ¶ 35 (citing *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 522 (1992)). "Unilateral" changes are those changes that alter the status quo without prior negotiation. *Vienna School District No. 55*, 162 Ill. App. 3d at 507. In determining whether an employer has made a unilateral change, we must consider whether the employer has altered the status quo. Whether a term or condition of employment is sufficiently established to constitute the status quo is an objective test. *Id.*. Determining the status quo requires consideration of the amount of discretion vested in the employer with respect to an established practice, in addition to consideration of the reasonable expectations of the employees with respect to the continuation of the established practice. *Id.* at 507-08.

¶ 35        In this case, the University is an educational employer as defined by section 2(a) of the Act and Dalaly, McMullen, and Amedeo are educational employees as defined by section

2(b) of the Act. 115 ILCS 5/2(a), (b) (West 2018). The Union is the exclusive representative of those employees pursuant to section 2(d) of the Act. See *id.* § 2(d). The University does not contest there was a practice among the universities of granting reciprocal tuition and fee waivers, which the ALJ determined constituted a status quo. See *Vienna School District No. 55*, 162 Ill. App. 3d at 507 ("A term or condition of employment must be an established practice to constitute the status quo."). The University also does not contest the terms and conditions of the employment of the University's noncivil service employees were changed when the tuition and fee waivers were no longer available at the other universities. See *Graduate Employees Organization, Local 6300, IFT/AFT*, 31 PERI ¶ 116 (IELRB 2012) (stating a change to intra-institutional tuition waivers was mandatory subject of bargaining). Rather, the University's challenge focuses on the source of the change. The University contends it did not have control over the other universities in order to make a change, unilateral or otherwise, to the tuition and fee waiver policy, so it had no duty to bargain regarding the change.

¶ 36 Employers are not expected to bargain over changes made by third parties over which the employers "have no control or influence." *Lamont's Apparel*, 268 NLRB at 1334. However, "where an employer can influence third-party decisions concerning modifications and continuance of employee benefits, then to that extent the employer possesses the ability to affect its own employees' terms and conditions of employment and, concomitantly, is obliged to bargain about changes that it can influence." *Id.* at 1335 (citing *Ford Motor Co.*, 441 U.S. at 503 (1979)); see *American Federation of State, County & Municipal Employees, AFL-CIO v. State Labor Relations Board*, 190 Ill. App. 3d 259, 264 (1989) (holding decisions interpreting similar National Labor Relations Act are persuasive authority).

¶ 37 In this case, the Board correctly noted an educational employer violates the Act

when it unilaterally changes the status quo involving a mandatory subject of bargaining without first bargaining in good faith. There was a status quo of the participating universities granting reciprocal tuition waivers to noncivil service employees prior to the summer of 2019. The Board also correctly noted an employer cannot be expected to bargain about third-party changes over which the employer has no control or influence. In concluding that the University made a unilateral change to the status quo, the Board relied upon the law established in *Ford* and *Lamont's Apparel* and found the University had potential leverage over the decisions made by the other universities, which was sufficient evidence of the University's control or influence over those universities' decisions to cease granting reciprocal tuition waivers. We find this conclusion is not supported by the law established in *Ford* and *Lamont's Apparel*. See *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50 ("[A] mixed question asks whether the facts satisfy the statutory standard or whether the rule of law as applied to the established facts is or is not violated."); *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Board*, 224 Ill. 2d 88, 98 (2007) ("While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order.").

¶ 38    In *Ford*, the union filed an unfair labor practice charge under the National Labor Relations Act against the employer for refusing to bargain over the increase in cafeteria and vending machine prices. *Ford*, 441 U.S. at 493. The United States Supreme Court upheld the conclusion of the National Labor Relations Board (NLRB) that in-plant food prices and services were mandatory bargaining subjects. *Id.* at 497. In response to the employer's argument that bargaining would be futile because the prices were controlled by a third-party supplier, the Court found bargaining would not be futile because the employer had at least future leverage over the

in-plant food prices. *Id.* at 503. The leverage arose from the fact that in its contract with the third-party vendor, the employer retained the right to review and control food services and prices. *Id.* In addition, the employer also had the ability to change suppliers at some point in the future. *Id.* The Court likened in-plant food services to other kinds of benefits that implicate outside suppliers, like health insurance, whereby the employer may not be able to control the price during the contract but had at least future leverage to change suppliers in the future. *Id.* at 503 n.15.

¶ 39    In *Lamont's Apparel*, the employer argued a change in commission percentages to its cosmetics sales employees was not a mandatory subject of bargaining for the employer because third-party vendors had total discretion over the commissions and the employer had no control. *Lamont's Apparel*, 268 NLRB at 1334. The NLRB acknowledged employers had no duty to bargain over third-party changes over which the employer had no control or influence but held the employer had a duty to bargain because it had exercised some influence over the change. *Id.* at 1335. Specifically, there was no evidence the third-party vendors independently considered changes in the rebate allocations. Rather, the employer initiated the reconsideration of the amount of commission by reaching out to the third-party vendors and requesting a reduction. *Id.* Thus, to the extent the employer influenced the process of changing the amount of the commission, the employer "possesse[d] the ability to affect its own employees' terms and conditions of employment." *Id.*

¶ 40    This case can be distinguished from both *Ford* and *Lamont's Apparel* on the basis there was no transactional business relationship between the University and the other universities. Transactional business relationships and the employers' ability to negotiate, or threaten to negotiate, with a different vendor were critical to the element of control found in

*Ford* and *Lamont's Apparel*. In contrast, in this case, there were no business relationships; the agreement to waive tuition was reciprocal, but purely gratuitous. The record does not reveal any contracts with the other universities, and the reciprocal waiver agreements were not the result of arms-length business transactions. Because the University lacked the ability to negotiate with a different vendor, the University did not have the same potential leverage over the third-party decisions as found in *Ford* and *Lamont's Apparel*. In addition, there was no evidence in the record the University initiated reconsideration of the tuition waiver benefit with the other universities. See *id.* (holding the employer's initiation of reconsideration of rebate allocations with vendors was evidence of influence). In fact, the record indicates the University was unaware of the cessation of the tuition and fee waivers by the other universities until informed by its own employees that the waivers were being denied, which underscores the University's lack of control. The University continued to do its part: it initially processed the tuition and fee waivers and forwarded them to the other universities. The other universities made the decision to no longer grant tuition waivers to noncivil service University employees. In addition, rather than supporting a finding that the University had some control, the University's continued promotion of the tuition and waiver benefit on its website and in its regulations further highlights the University's lack of control.

¶ 41    Simply stated, the conclusion that the University had potential leverage over decisions made by third parties was not sufficient evidence of control or influence under the law as established in *Ford* and *Lamont's Apparel*, so the Board's conclusion that the University made a unilateral change to a mandatory subject of bargaining was clearly erroneous.

¶ 42                                  III. CONCLUSION

¶ 43    For the reasons stated, we reverse the Board's judgment.

- 18 -

¶ 44        Reversed.